Charles R. KING, Plaintiff,

v.

VERIFONE HOLDINGS, INC.,
a Delaware Corporation,
Defendant.

C.A. No. 5047–VCS.

Court of Chancery of Delaware.

Submitted: April 25, 2010.
Decided: May 12, 2010.

David A. Jenkins, Esquire, Michele C. Gott, Esquire, Smith, Katzenstein & Furlow LLP, Wilmington, DE; Judith S. Scolnick, Esquire, Tom Laughlin, Esquire, Scott + Scott LLP, New York City, for Plaintiff Charles R. King.

Raymond J. DiCamillo, Esquire, Kevin M. Gallagher, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE; Robert A. Sacks, Esquire, Sullivan & Cromwell LLP, Los Angeles, CA, for Defendant VeriFone Holdings, Inc.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

A plaintiff owning a small number of shares in a corporation rushed off to a federal court to file a derivative suit shortly after the corporation announced that it had to restate its financial statements. The complaint was for money damages, most principally those damages the corporation might suffer if it faced liability in securities suits. There was no basis for exigency and no expedited treatment was sought.

But haste was the order of the day because the plaintiff's lawyers wanted to win the filing Olympics. And they did. The court handling the derivative suit rewarded the plaintiff and his counsel with lead plaintiff status.

But in the lawyers' haste, they did not conduct an adequate pre-suit investigation. And when their complaint was confronted with a motion to dismiss for failure to plead demand excusal, it could not survive that motion.

Fortunately for the plaintiff and his lawyers, the federal court did not dismiss the case with prejudice as to him, and freshen the litigation environment so other plaintiffs whose lawyers had conducted a pre-suit investigation might feel that they could now lead the case. Instead, the court left the gold medal-winning, but dismissal motion-losing, plaintiff in its lead sinecure and encouraged him to file yet another lawsuit—this one—in order to do what he should have done first—obtain books and records in order to determine whether he had grounds for a claim and, as important, whether he had grounds to plead demand excusal as to any such claim.

Thus, the federal court suggested the plaintiff do indirectly what the plaintiff could not do in the derivative suit he filed—obtain information in aid of an already pending derivative suit. Under federal case law interpreting Federal Rule of Civil Procedure 23.1, the plaintiff could not

obtain discovery.[1] Without considering that fact, the federal court suggested that the plaintiff file a books and records action to get information to prepare a viable complaint. The plaintiff, with his leadership role intact, happily took up the chance to enmesh the corporation in two lawsuits at once and filed this action.

In the face of that action, the corporation has moved to dismiss, arguing that it is improper for a stockholder to rush to court to file a derivative suit, causing the corporation to expend defense costs in responding to that lawsuit, and then seek to remedy the stockholder's own lack of presuit investigation by filing yet another lawsuit, a books and records action, to obtain information to help the stockholder remedy deficiencies that its own self-serving rush to court undoubtedly helped create.

In this decision, I conclude that such a stockholder lacks a proper purpose and may not use § 220 of the Delaware General Corporation Law to rescue him from his own self-interested premature rush to file. Once a plaintiff files a derivative suit, he has made his election. Any informational access granted to a derivative plaintiff from the corporation ought to occur in the forum in which the plaintiff has made the choice to sue the defendant, and under the rules of civil procedure governing the derivative claim. The corporation and, most important, its investors should not suffer the costs of duplicative proceedings. Nor should the judicial system.

As important, to permit a stockholder access to books and records in these circumstances would exacerbate incentives that already work to disadvantage investors. For years, our Supreme Court has made clear that derivative plaintiffs should seek books and records and otherwise conduct an adequate investigation into demand excusal *before* rushing off to file a derivative complaint.[2] Likewise, our Supreme Court has made clear that diligent plaintiffs who do so should not be penalized, and thus courts should be careful not to reward counsel who rapidly fire off complaints in order to secure first-filed status.[3] Representative litigation plays an important role in protecting the interests of stockholders, but it will not optimally serve investors unless suits are actually filed on the basis of a real concern that wrongdoing has occurred and after a proper investigation.

■ To be consistent with these important public policy interests, stockholders who seek books and records in order to determine whether to bring a derivative

1.  *See, e.g., In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) ("A corollary of [Rule 23.1] is that discovery generally may not be used to supplement allegations of demand futility.") (*citing Beam v. Stewart*, 845 A.2d 1040, 1056 (Del.2004)); *Starrels v. First Nat. Bank of Chicago*, 870 F.2d 1168, 1175–76 (7th Cir.1989) ("Rule 23.1 and its parallel in Delaware practice require the court to determine *at the pleading stage* whether demand was necessary.") (emphasis added).

2.  *See, e.g., Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 571 (Del.1997); *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70, 78 (Del.1997), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Grimes v. Donald*, 673 A.2d 1207, 1218 (Del.1996), *overruled on other grounds, Brehm*, 746 A.2d 244; *see also Beiser v. PMC–Sierra, Inc.*, 2009 WL 483321, at *3 (Del.Ch. Feb.26, 2009); *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *4 (Del.Ch. Jan. 9, 2003); *White v. Panic*, 793 A.2d 356, 364 (Del.Ch. 2000), *aff'd*, 783 A.2d 543 (Del.2001).

3.  *Rales v. Blasband*, 634 A.2d 927, 934 n. 10 (Del.1993); *see also Rosen v. Wind River Sys., Inc.*, 2009 WL 1856460, at *5 (Del.Ch. June 26, 2009) (citing *Biondi v. Scrushy*, 820 A.2d 1148, 1162 (Del.Ch.2003)); *TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1654504, at *3 (Del.Ch. Oct. 17, 2000).

suit should do so before filing the derivative suit. Once a plaintiff has chosen to file a derivative suit, it has chosen its course and may not reverse course and burden the corporation (and its other stockholders) with yet another lawsuit to obtain information it cannot get in discovery in the derivative suit.

## II. *Factual Background* [4]

In November 2006, VeriFone Holdings, Inc., a Delaware corporation that designs and markets secure electronic payment systems, acquired Lipman Electronic Engineering Ltd. Shortly after the acquisition, on December 3, 2007, VeriFone announced that it would restate its financial statements for the first three quarters of fiscal year 2007 due to accounting errors arising from the integration of Lipman's inventory systems with VeriFone's.[5] These accounting errors had led to an SEC investigation, which culminated in the SEC filing a civil complaint against VeriFone.[6]

As soon as VeriFone announced on December 3, 2007 that it would restate its financial statements, lawyers sped to the court and filed a number of putative class actions and purported derivative actions. The rush to the courthouse is noteworthy.

The underlying securities suits sought relief for investors who purchased VeriFone shares before the restatement at an arguably inflated price and who allegedly suffered damages when VeriFone's stock price dropped after the announcement of the restatement.[7] Therefore, as is typical in a stock-drop situation, there was no reason beneficial to investors for complaints to be filed hastily and without a period of investigation and reflection. The securities complaints appear to have sought no expedited treatment or injunctive relief, they simply sought monetary damages for the consequences of past events.[8]

Critically, the lack of an investor-beneficial reason for urgent filing was especially absent as to the derivative suit filed by plaintiff Charles R. King ("King"), who owns 3,000 shares of VeriFone common stock. Why? Because the major category of damages sought by King on VeriFone's behalf was to hold certain directors and officers liable to indemnify VeriFone for any damages or costs it would incur in resolving the securities suits addressing the restatement.[9] Thus, the derivative suit could not rationally proceed ahead of the securities suits.

But of course there was a rational reason for the haste; albeit one that has nothing to do with the best interests of VeriFone, its stockholders, or its prior stockholders who had bought and sold during the relevant time frame. That reason is related to the self-interest of the lawyers jockeying for position as lead counsel. In King's case, his counsel admits that she rapidly filed the complaint on his behalf, and eschewed seeking books and records at that time, in order to have the first derivative complaint on file and therefore to be the winner in the lead counsel Olympics race.[10] To that end,

---

4. These facts are drawn from the complaint and the documents it incorporates.

5. Compl. ¶ 5.

6. *Id.* ¶ 6.

7. *See In re VeriFone Holdings, Inc. Sec. Litig.,* 2009 WL 1458211, at *1 (N.D.Cal. May 26, 2009).

8. *See id.* at *2.

9. *See* Comp. Ex. 1 (amended complaint in the derivative action) at 64.

10. *King v. VeriFone Holdings, Inc.,* C.A. No. 5047–VCS, at 48, 52 (Del.Ch. Mar. 10, 2010) (TRANSCRIPT) (plaintiff's counsel indicating that she had not sought expedition, and that

King's complaint was filed on December 14, 2007, a mere eleven days after VeriFone's announcement.

Counsel's sense of the incentive system at work was vindicated. All of the federal securities and derivative suits relating to the VeriFone stock drop were consolidated before a single judge of the United States District Court for the Northern District of California (the "Federal Court").[11] King and his counsel were crowned as lead plaintiff and lead counsel in the derivative action because they won the race to file first.

But winning that race came at an eventual price. Perhaps in large measure because King and his counsel did not undertake any responsible pre-suit investigation, the complaint was soon challenged on demand excusal grounds. This challenge was especially formidable because the central claim that King asserted in the derivative suit is that VeriFone's board of directors failed to comply with their duty of oversight under Caremark[12] in managing the integration process following the merg- er with Lipman. In other words, King did not allege that the independent board majority at VeriFone had purposely committed accounting fraud, but that they were so indolent in their monitoring of management that they should be held responsible for the accounting problems.[13] Because of the stringency of the Caremark standard and the presence of an exculpatory charter provision, King faced a difficult pleading burden. After his initial complaint, King amended his complaint almost eleven months later in October 2008.[14] To aid him in amending that complaint, King did not seek discovery from the defendants in the derivative action.

The reason, his counsel explained at argument, is that such discovery would not have been granted by the Federal Court if the defendants had objected.[15] As King's counsel admits, there is abundant federal authority implementing Federal Rule of Civil Procedure 23.1 that holds that a derivative plaintiff cannot obtain discovery until it meets its pleading burden to show grounds for demand excusal.[16] King

King sought to be the first to file in the "lead plaintiff fight").

11. See In re VeriFone Holdings, Inc. Sec. Litig., No. 07–06140 MHP (N.D.Cal.); In re VeriFone Holdings, Inc. S'holder Deriv. Litig., No. C07–06347 MHP, 2009 WL 1458233 (N.D.Cal.).

12. In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del.Ch.1996).

13. Compl. Ex. 1 (amended complaint in the derivative action) ¶¶ 95, 97, 105.

14. See Def.'s Op. Br. Ex. D (docket for the derivative action).

15. King v. VeriFone Holdings, Inc., C.A. No. 5047–VCS, at 58 (Del.Ch. Mar. 10, 2010) (TRANSCRIPT) (plaintiff's counsel acknowledging that Rule 23.1 generally bars discovery to improve a complaint's ability to survive a dismissal motion).

16. See CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1831 (Civil 3d 2009) (citing federal cases). Thus, the federal courts take an approach to Rule 23.1 identical to that taken by our own courts, under our own Rule 23.1. Compare In re Openwave Sys. Inc. S'holder Deriv. Litig., 503 F.Supp.2d 1341, 1353 (N.D.Cal.2007) ("Rule 23.1 reflects a Congressional intent that derivative actions pass certain hurdles before being allowed to proceed with [the] normal course of litigation, including discovery.") (citing In re First Bancorp Deriv. Litig., 407 F.Supp.2d 585, 586–87 (S.D.N.Y.2006)) with Rales, 634 A.2d at 934 n. 10 (noting that derivative plaintiffs "are not entitled to discovery to assist their compliance with Rule 23.1" (citing Levine v. Smith, 591 A.2d 194, 208–10 (Del.1991))); see also 1 DONALD J. WOLFE & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 9.02[b][3], at 9–69 (2009) (citing Delaware cases).

therefore chose not to seek discovery and to challenge this precedent.

King also forewent the chance to say to the Federal Court and to the defendants: "My bad, I filed prematurely. I am going to dismiss the case without prejudice, ask you to vacate the organizational order, and give me a chance to do what I should have done first, which is to file a books and records action, actually read the records obtained, and then make a decision whether to file. I regret the error but want to do the right thing." Instead, King pressed ahead with his amended complaint and joined issue with the defendants about whether it pled grounds for demand excusal.

King then lost that contest and the Federal Court dismissed his complaint, but the Federal Court did not dismiss King's complaint with prejudice, even as to him only. Rather, the Federal Court granted King leave to amend his complaint yet again, and even suggested filing an action under § 220 of the Delaware General Corporation Law in this court to obtain facts necessary to establish demand futility.[17] That decision was curious for several reasons. First, the Federal Court effectively bypassed the federal jurisprudence that denies derivative plaintiffs discovery until they plead demand excusal.[18] Obviously, having all parties before it, the most efficient way for the Federal Court to grant King information to help him plead demand excusal was through controlled discovery under the Federal Rules of Civil Procedure. But, without pondering the multiple policy implications of doing so, the Federal Court suggested that King open up another litigation front over 3000 miles away. Second, in doing so, the Federal Court rewarded King and his counsel for wasting the corporation's resources through protracted dismissal briefing and other litigation costs over a prematurely filed derivative action by leaving King in as lead plaintiff. That is, by its order, the Federal Court made clear that it was still King's case, despite King's failure to proceed in the manner best for VeriFone and its stockholders. Thus, the order rewarded a plaintiff and his counsel for winning the filing Olympics and engaging in behavior contrary to the interests of VeriFone, and discouraged the entry of other possible plaintiffs who might have wished to proceed in the expected and investor-beneficial fashion, by investigating first and suing second. For their part, VeriFone and its stockholders got to pay the costs of having the corporation and its directors and officers face litigation in two separate forums.

In turn, King served a books and records demand letter on VeriFone on June 9, 2009. VeriFone made the tactical decision to try to work out that demand so that it could reduce costs and get a definitive decision on a complaint King would finally be required by the Federal Court to stand or fall upon. In response to King's demand, VeriFone produced approximately

---

17. *In re VeriFone Holdings, Inc. S'holder Litig.*, 2009 WL 1458233, at *13 (N.D.Cal. May 26, 2009) ("Plaintiffs may also engage in further investigation to assert additional particularized facts. Shareholders may inspect books and records of a corporation, but must demonstrate a proper purpose for seeking inspection. In order to inspect these books and records, plaintiffs must make a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing. Since plaintiffs' purpose is to obtain the particularized facts needed to adequately allege demand futility and to show corporate wrongdoing, rather than to investigate new potential claims, plaintiffs should gain access to certain of VeriFone's documents and records for the Relevant Period.") (internal citations omitted).

18. *See supra* note 1.

1,350 pages of documents relating to the Lipman acquisition and the VeriFone Board's audit committee's oversight of the integration of Lipman's inventory system. But, VeriFone refused to produce the audit committee report and its underlying documents, prepared by VeriFone's counsel, summarizing the audit committee's review of the integration process. VeriFone took the position that those documents were subject to various claims of privilege.

On October 8, 2009, the parties attempted to mediate their dispute. After that mediation attempt proved unsuccessful, King filed this books and records action (the " § 220 Action") on November 6, 2009, nearly six months after his complaint in the derivative suit was dismissed, and approximately eighteen months after filing the original complaint in that suit. King's only stated purpose for examining the books and records of VeriFone is to seek books and records that will help him plead a viable claim for demand excusal in the pending derivative action in Federal Court.[19] Meanwhile, King filed yet another amended complaint in the derivative action on December 10, 2009, and another round of dismissal briefing has been completed.[20]

VeriFone argues that (1) seeking books and records to bolster King's complaint in the derivative action is not a proper purpose under § 220, and (2) in any event, the report and the underlying documents are protected by the attorney-client privilege and the work product doctrine. On those bases, VeriFone has moved to dismiss King's § 220 Action under Court of Chancery Rule 12(b)(6). King argues that his purpose in bringing the § 220 Action is proper, and that the documents sought are not privileged.

### III. *Analysis*

■■■ Because I find that King does not have a proper purpose under § 220, and that his complaint must be dismissed on that basis, I do not analyze VeriFone's additional arguments regarding the applicability of the attorney-client privilege and the work product doctrine.[21]

---

**19.** Compl. ¶¶ 11, 13.

**20.** Def.'s Op. Br. Ex. D; *King v. VeriFone Holdings, Inc.*, C.A. No. 5047–VCS, at 8 (Del. Ch. Mar. 10, 2010) (TRANSCRIPT).

**21.** At oral argument and in supplemental letters to the court, King raised an additional argument: that VeriFone waived its defense that King's § 220 demand does not have a proper purpose in pre-litigation letters and by producing a large number of documents in an attempt to settle the dispute. *See King v. VeriFone Holdings, Inc.*, C.A. No. 5047–VCS, at 71–78 (Del.Ch. Mar. 10, 2010) (TRANSCRIPT); Letter from David A. Jenkins to the Hon. Leo E. Strine, Jr. (Mar. 17, 2010). But although it discussed some of the facts underlying VeriFone's alleged waiver, King's answering brief neither explicitly made the waiver argument nor cited any case law to that effect. *See* Pl.'s Ans. Br. 10–14. A party's failure to raise an argument in its answering brief constitutes a waiver of that argument. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del.1999) ("Issues not briefed are deemed waived." (citing *Murphy v. State*, 632 A.2d 1150, 1152 (Del.1993) and *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 140 n. 3 (Del.1997))). In any event, VeriFone did not waive its proper purpose defense because VeriFone's pre-litigation correspondence, made in an effort to settle the dispute, was not a "clear, unequivocal, and decisive" indication that it voluntarily and intentionally relinquished a known right. *See DiRienzo v. Steel Partners Holdings, L.P.*, 2009 WL 4652944, at *4–5 (Del.Ch. Dec. 8, 2009) ("Under Delaware law, a waiver is 'the voluntary and intentional relinquishment of a known right.' A waiver may be express or implied, but either way, it must be unequivocal. An express waiver exists where it is clear from the language used that the party is intentionally renouncing a right that it is aware of.... Where no express language is used, an implied waiver of a right is possible, but only if there is 'a clear, unequivocal, and decisive act of the party demonstrating relinquishment of the right.' ") (citations omitted).

## A. *Legal Standard*

██ The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[22] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[23]

## B. *Seeking Books And Records To Supplement Discovery In The Derivative Action Is Not A Proper Purpose Under § 220*

██ King's purported purpose, inspired by the Federal Court's guidance, for seeking VeriFone's corporate records is to obtain information to show that making a demand on the VeriFone board would have been futile.[24] But that purpose is improper for a number of well-established public policy reasons. First, King is doing a costly, inefficient end-run around the discovery rules applicable in the derivative action that he, and no one else, chose to initiate against VeriFone. As discussed, the case law interpreting Federal Rule of Civil Procedure 23.1 generally precludes a derivative plaintiff from suing first, and then begging for discovery to aid him in pleading a viable demand excusal complaint.[25] Rule 23.1's heightened pleading standard is there for a reason. As our Supreme Court has stated:

> Rule 23.1 requires, in part, that the plaintiff must allege with particularity facts raising a reasonable doubt that the corporate action being questioned was properly the product of business judgment. The rationale of Rule 23.1 is twofold. On the one hand, it would allow a plaintiff to proceed with discovery and trial if the plaintiff complies with this rule and can articulate a reasonable basis to be entrusted with a claim that belongs to the corporation. On the other hand, the rule does not permit a stockholder to cause the corporation to expend money and resources in discovery and trial in the stockholders quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation.[26]

King's request for books and records undermines that purpose by seeking to use § 220 as a tool for circumventing Rule 23.1. The only difference between what King wants here and a grant of targeted discovery in the derivative action is that

---

**22.** *See Malpiede v. Townson,* 780 A.2d 1075, 1082–83 (Del.2001); *Romero v. Career Educ. Corp.,* 2005 WL 1798042, at *2 (Del.Ch. July 19, 2005); *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

**23.** *See Malpiede,* 780 A.2d at 1083; *Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

**24.** *See supra* page 359.

**25.** *See supra* note 1; *see also In re Merck & Co.,* 493 F.3d at 400 (explaining that the demand requirement in Rule 23.1 would "be effectively circumvented" if parties were allowed discovery to supplement allegations of demand futility); *In re Kauffman Mutual Fund Actions,* 479 F.2d 257, 263 (1st Cir. 1973) (observing that, under Rule 23.1, the stockholder may not plead in general terms, hoping that, by discovery or otherwise, he can later establish a case), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973).

**26.** *Brehm,* 746 A.2d at 255 (citations omitted); *see also* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 1831, at 118 ("[T]he importance of allowing corporations to govern themselves to the extent possible, avoiding unnecessary judicial involvement in the internal affairs of business organizations, and discouraging harassing strike suits ... require an extensive statement as to why no demand was made.").

seeking it here is even more inefficient, costly, and contrary to public policy because it permits King to burden the company in a second simultaneous lawsuit simply because he rushed prematurely to court in the first suit.

Second and relatedly, filing a § 220 action in this court in order to get discovery in a case pending in another court conflicts with the well-established and sensible policies against subjecting defendants to simultaneous suits in separate forums. Yoking this court as an adjunct to another court thousands of miles away wastes scarce judicial resources through repetitive litigation, and exposes the corporation and its shareholders to unnecessary additional defense costs. A number of doctrines, such as res judicata and the Delaware Supreme Court's ruling in *McWane*,[27] operate to prevent the inefficiencies arising from litigating in multiple forums.[28] There is no reason to make an exception to the policy reflected in those long-standing doctrines here in the § 220 context.

Finally, and perhaps most importantly, to allow King to use § 220 in an after-the-fact manner to bolster his derivative complaint exacerbates the perverse incentives motivating too many representative plaintiffs' unseemly and inefficient race to the courthouse. The only reason King rushed to file his complaint in the derivative action and has since sought supplementary discovery through the § 220 process is so that he and his counsel could win the race to become lead plaintiff and lead counsel.[29] But, the intended end of the derivative lawsuit is not furthering the interests of fast-filing plaintiffs or their lawyers; rather, the derivative suit is one of several tools that stockholders may use to further the corporation's best interests.[30] Because that tool can be misused if it is not wielded properly, courts must be mindful to create incentives that encourage the kind of litigation conduct that is more likely to benefit investors as a class.[31] The derivative

---

**27.** *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*, 263 A.2d 281 (Del.1970) ([A]s a general rule, litigation should be confined to the forum in which it is first commenced....).

**28.** *See Ashall Homes Ltd. v. ROK Entertainment Group Inc.*, 992 A.2d 1239, 2010 WL 1663950, at *7 (Del.Ch. Apr. 23, 2010) (discussing the similar policy rationale behind res judicata and *McWane*).

**29.** *See supra* pages 356–57.

**30.** *See Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984) ("The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management. The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it.").

**31.** The Delaware Supreme Court has noted the need for courts to temper the incentives for plaintiffs' counsel to be immoderate in the pursuit of their own interests:

> The jurisprudence of *Aronson* and its progeny is designed to create a balanced environment which will: (1) on the one hand, deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms; and (2) on the other hand, permit suit by a stockholder who is able to articulate particularized facts showing that there is a reasonable doubt either that (a) a majority of the board is independent for purposes of responding to the demand, or (b) the underlying transaction is protected by the business judgment rule.

*Grimes*, 673 A.2d at 1216–17 (citations omitted). The wide spread concerns about potential misuse of the derivative suit have been well summarized:

> The courts have recognized that "derivative actions brought by minority stockholders could, if unconstrained, undermine the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." Likewise, "it has long been recognized," the derivative action

suit's central purpose is compromised when counsel prematurely file thinly-substantiated complaints that cannot meet the heightened Rule 23.1 particularized pleading standard only in order to beat their competitors in the plaintiffs' bar, and then attempt to compensate for those inadequate pleadings through an after-the-fact process that needlessly saps corporate funds through drawn-out dismissal motion practice and simultaneous lawsuits in separate forums.[32] Perhaps most critically, perpetuating this inefficient system can only demoralize plaintiffs' counsel who desire to diligently investigate the facts be-

fore filing a complaint in order to present a pleading that adequately pleads demand excusal and viable claims.

What does serve the interests of the public and the corporation's shareholders in this and similar derivative suit situations, however, is a process where plaintiffs conduct a thorough investigation in order to fashion adequate pleadings—using § 220 if necessary—*before* filing their initial complaint. That is why the Delaware courts have consistently admonished plaintiffs to use § 220 *before* filing a derivative action.[33]

---

is susceptible to abuse in cases where derivative claims are filed "more with a view to obtaining a settlement resulting in fees to the plaintiff's attorney than to righting a wrong to the corporation (the so-called 'strike suit')...." Prerequisites to the commencement of derivative litigation and other special rules governing derivative litigation have developed in order "to filter such cases at an early stage more finely" than is the case in other types of litigation and "prevent abuse of this remedy." DENNIS J. BLOCK, NANCY E. BARTON & STEPHEN A. RADIN, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 1384–85 (5th ed. 1998) (citations omitted); *see also* STEPHEN M. BAINBRIDGE, CORPORATION LAW AND ECONOMICS 365–68 (2002) (noting that "[m]any of the rules governing derivative litigation are best understood as a response to ... abuses" arising from the incentive for plaintiffs attorneys to bring non-meritorious lawsuits or to prematurely settle meritorious lawsuits).

32. *See Beiser*, 2009 WL 483321, at *3 (noting that requiring § 220 actions to be brought before filing a derivative action "may prevent 'expensive and time-consuming procedural machinations that too often occur in derivative litigation,'" and that "'[i]t's wholly unrealistic and burdensome for plaintiffs to believe that you can invoke compulsory litigation machinery ... and then turn around and use [§ ]220 [to obtain books and records]. It is a whipsaw on the company and it's unduly burdensome, and it's a whipsaw on the processes of dispute resolution.'") (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 279 n. 5 (Del.Ch.2003)

and *Parfi Holding, AB v. Mirror Image Internet, Inc.*, C.A. No. 18457, at 6 (Del. Ch. Mar. 23, 2001) (TRANSCRIPT)).

33. The Delaware Supreme Court has explained § 220's proper purpose in preparing derivative complaints as follows:

Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, they have many avenues available to obtain information bearing on the subject of their claims. For example, there is a variety of public sources from which the details of a corporate act may be discovered, including the media and governmental agencies such as the Securities and Exchange Commission. In addition, a stockholder who has met the procedural requirements and has shown a specific proper purpose may use the summary procedure embodied in 8 *Del. C.* § 220 to investigate the possibility of corporate wrongdoing.... Surprisingly, little use has been made of section 220 as an information-gathering tool in the derivative context. Perhaps the problem arises in some cases out of an unseemly race to the court house, chiefly generated by the first to file custom seemingly permitting the winner of the race to be named lead counsel. The result has been a plethora of superficial complaints that could not be sustained. *Nothing requires the Court of Chancery, or any other court having appropriate jurisdiction, to countenance this process by penalizing diligent counsel who has*

One approach to dealing with prematurely filed complaints suggests itself. Obviously, a court may be concerned that a "with prejudice" dismissal of a derivative complaint will injure the corporation and its investors if the court suspects that a more diligent plaintiff, who had conducted a books and records investigation, performed a more thorough review of public records, and taken more time to conduct the legal research to craft a quality pleading, could have pled demand excusal. In that circumstance, the court could dismiss the complaint with prejudice only as to that lead plaintiff but not as to other plaintiffs, make sure that notice is given, and therefore effectively re-open the contest for the lead counsel appointment. Doing so would make that a contest over quality, not speed.[34]

Here, the exact opposite approach was taken, and King was rewarded for his inadequate pre-suit investigation by being given multiple chances, and even being invited to file this § 220 Action. But the Federal Court's suggestion in dictum does not bind this court, nor does its approach persuade.[35] The Federal Court's dictum

---

*employed these methods, including section 220, in a deliberate and thorough manner in preparing a complaint that meets the demand excused test of Aronson.*

*Rales*, 634 A.2d at 935 n. 10 (internal citations omitted; emphasis added); *see also Sec. First Corp.*, 687 A.2d at 571 ("[A] Section 220 proceeding may serve a salutary mission as a prelude to a derivative suit."); *Scattered Corp.*, 701 A.2d at 78 (admonishing the plaintiff for not using § 220 to investigate demand futility). Chancellor Chandler expertly summarized the problem and its solution as follows:

Too often judges of this Court face complaints filed hastily, minutes or hours after a transaction is announced, based on snippets from the print or electronic media. Such pleadings are remarkable, but only because of the speed with which they are filed in reaction to an announced transaction. It is not the race to the courthouse door, however, that impresses the members of this Court when it comes to deciding who should control and coordinate litigation on behalf of the shareholder class. In fact, this Court and the Delaware Supreme Court have repeatedly emphasized the importance of plaintiffs' counsel taking the time to use the "tools at hand" (such as a § 220 books and records action) to develop a record sufficient to craft pleadings with particularized factual allegations necessary to survive the inevitable motions to dismiss.

*TCW*, 2000 WL 1654504, at *3 (citations omitted); *see also Beiser*, 2009 WL 483321, at *3; *Freund v. Lucent Techs., Inc.*, 2003 WL 139766, at *4 (Del.Ch. Jan. 9, 2003) (citing *Grimes*, 673 A.2d at 1218).

**34.** Perhaps it is time for the reversal of the traditional presumption in favor of first filers in the derivative suit context. When a derivative plaintiff files a damages action hastily in the wake of a public announcement, there is no basis for expediting the case to further the interests of the corporation and its stockholders, and, when the derivative plaintiff forewent a books and records investigation and a period of deep reflection on the publicly available documents and the law, should not the presumption be that the plaintiff is not fit to serve as the lead fiduciary for the corporation and its stockholders? What rational argument is there that it advances the legitimate interests of investors to give a leg up to the first to get to court in a situation when being first to court is likely to compromise the ability of the filing plaintiff to sustain his derivative complaint? Admittedly, there are no easy answers to the question of how to select lead counsel in representative actions, but what is certain is that rewarding plaintiffs and their counsel who sue first, and investigate and think second is likely to maximize the costs to investors of representative suits and minimize the benefits. Put simply, the speed racer approach might benefit certain interests, but those interests do not include the investors of corporations or the other societal constituencies dependent on the effective and efficient governance of corporations.

**35.** *See Beiser*, 2009 WL 483321, at *3 n. 26 (noting that the federal court's suggestion in that dispute to use § 220 should not "be interpreted pro or con in some interpretation of what the Delaware courts should or should not do").

did not consider the policy behind Rule 23.1, the costs to investors and the court system of duplicative litigation, or the perversity of having named someone lead counsel because they rushed to court prematurely and leaving that person in lead counsel status while giving that lawyer a chance—at the corporation's, and therefore its investors', expense—to do what she was supposed to have done before filing a plenary action.[36]

In reaching the conclusion that King lacks a proper purpose, I am aided by Vice Chancellor Lamb's well-reasoned decision in a similar context. In *Beiser v. PMC–Sierra, Inc.*, this court confronted nearly identical circumstances to those under consideration here, and dismissed the complaint.[37] Like here, *Beiser* involved a § 220 claim brought by a federal derivative plaintiff whose complaint was dismissed for failure to prove demand futility, and where the federal judge had suggested to the derivative plaintiff that he seek

books and records in this court under § 220.[38] Also like this case, the derivative plaintiff in *Beiser* waited nearly two years from the time he filed his derivative suit to the time he filed his § 220 action.[39] Finally, discovery in the federal derivative suit in *Beiser* was stayed pursuant to the Private Securities Litigation Reform Act of 1995.[40] Based on those facts, the court held that the plaintiff there had not stated a proper purpose for his § 220 action because (1) the "dilatory nature" of his § 220 filing made it "difficult ... to plead a proper purpose because the most obvious end use (to aid in filing a subsequent action) is no longer available;" and (2) "attempting to obtain discovery for use in a case where such discovery is clearly prevented by federal law, without more, will not satisfy the 'proper purpose' requirement of § 220." [41]

Those two considerations are equally forceful here.[42] First, King has not

---

**36.** Cf. *Saito v. McKesson*, 2004 WL 3029876, at *10, n. 91 (Del.Ch. Dec.20, 2004) (refusing to "reward [plaintiffs'] race to the courthouse at the expense of the orderly administration of justice").

**37.** *Beiser*, 2009 WL 483321, at *4.

**38.** *In re PMC–Sierra, Inc. Deriv. Litig.*, 2008 WL 2024888, at *4 (N.D.Cal. May 8, 2008).

**39.** *Beiser*, 2009 WL 483321, at *1.

**40.** *Id.*

**41.** *Id.* at *3–4.

**42.** In an effort to avoid the application of *Beiser*, King argues that this court's decision in *Melzer v. CNET Networks, Inc.* controls. 934 A.2d 912 (Del.Ch.2007). In that case, this court held that the plaintiffs were entitled to books and records under § 220 that would help them "replead demand futility" in their already-filed derivative action. *Id.* at 919. But, that case is distinguishable. The fundamental issue here—whether King's purpose for his § 220 demand is proper—was elimi-

nated in *Melzer* by the agreement of the parties, who stipulated that the plaintiffs had a proper purpose. *Id.* at 918.

In a subsequent letter to the court, King has also argued that a pair of this court's decisions also supports his position that § 220 can be used to gather information to replead demand futility in an ongoing derivative action. *See* Letter from David A. Jenkins, Esquire to the Hon. Leo E. Strine, Jr. (Apr. 12, 2010). First, King cites *Ash v. McCall*, a case where this court dismissed the plaintiff's derivative complaint without prejudice and recommended that plaintiffs use § 220 "to obtain information necessary to sue derivatively." 2000 WL 1370341, at *15 n. 56 (Del.Ch. Sept. 15, 2000). Then, King cites *Saito v. McKesson*, where this court granted one of the *Ash* plaintiffs access to certain books and records pursuant to § 220. 2001 WL 818173, at *6. Based on this combination of cases, King argues that this court has allowed derivative plaintiffs to use § 220 to bolster a dismissed complaint. But King's argument overlooks the fact that *Saito* did not address the issue here—whether using § 220 in that way is a

brought his § 220 Action with alacrity. Instead, he filed his § 220 complaint over eighteen months after filing his original derivative complaint.[43] Over that time period, he has amended his complaint twice, has caused the corporation to brief two rounds of dismissal briefing, and would undoubtedly amend the complaint yet again were his § 220 Action successful,[44] requiring a third costly round of briefing on a motion to dismiss. Second, King is simply trying to use § 220 to obtain discovery that is either unnecessary or unavailable in the derivative action. Even though there has been no PSLRA stay in the derivative action as there was in *Beiser*, the fact is that King has not requested discovery in that action,[45] despite the reality that that was the most obvious, nonburdensome, and efficient route to obtain information relevant to his case. That failure to request discovery indicates either (1) that the documents sought are not discoverable under the Federal Rules of Civil Procedure, or (2) that King anticipated that a discovery request would be denied under Rule 23.1 of the Federal Rules of Civil Procedure. In either event, King's § 220 demand is for an improper purpose. If the corporate records sought were not relevant to the derivative litigation within the broad concept of relevancy that applies to discovery, then King is not entitled to them under § 220, which is not a license to conduct unwarranted "fishing expeditions."[46] And, if King has avoided requesting discovery in the derivative action because it would be denied under Rule 23.1, then he is attempting to use § 220 to make an end-run around the Federal Rules of Civil Procedure in a manner no different than was the case in *Beiser*.[47]

## IV. Conclusion

For the reasons discussed above, King has not stated a proper purpose for his § 220 demand. Therefore, VeriFone's motion is hereby GRANTED and King's com-

proper purpose. In *Saito*, the defendant's defenses were limited to the following:

> The defendant argues that the plaintiff is not entitled to other books and records because they are beyond the scope of his asserted purposes; the plaintiff is not entitled to documents relating to claims which he has no standing to pursue; the plaintiff is not entitled to documents from the wholly-owned, and legally distinct, subsidiary HBOC; and, the plaintiff is not entitled to records of third parties that the defendant has in its possession as a result of formal and informal discovery in various lawsuits.

*Id.* at *3. Therefore, *Saito* did not address the question raised here. Furthermore, although he cited to *Saito* in his answering brief for another proposition of law, King failed to make the argument that he presented in his supplemental letter, sent to the court over a month after oral argument held on March 10, 2010. *Compare* Letter from David A. Jenkins, Esquire to the Hon. Leo E. Strine, Jr. (Apr. 12, 2010) *with* Pl.'s Ans. Br. 14; *see also* *Emerald Partners*, 726 A.2d at 1224 ("Issues not briefed are deemed waived." (citing *Mur-*

*phy*, 632 A.2d at 1152 and *Loudon*, 700 A.2d at 140 n. 3)).

**43.** *See supra* page 359.

**44.** *King v. VeriFone Holdings, Inc.*, C.A. No. 5047–VCS, at 75 (Del.Ch. Mar. 10, 2010) (TRANSCRIPT) (plaintiffs' counsel stating that "there was also a conversation with [the] Judge ... where she said 'I understand that your books and records will probably be pending while you have to file your second amended complaint.... If you need to guild the lily or plug it up with information you get from Delaware, you may do so.' So we need this information to plug it up, guild the lily.... I guess it was a tacit recognition that there could be another amended complaint before there's a hearing on the motion to dismiss the second amended complaint").

**45.** *See supra* pages 357–58.

**46.** *See Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 118 (Del.2006).

**47.** *Beiser*, 2009 WL 483321, at *3–4.

plaint is DISMISSED with prejudice. IT
IS SO ORDERED.