**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

JOSEPH R. SLIGHTS III
VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone: (302) 739-4397
Facsimile: (302) 739-6179

August 12, 2016

Joel Friedlander, Esquire
Friedlander & Gorris, P.A.
1201 North Market Street, Suite 2200
Wilmington, DE 19801

David A. Jenkins, Esquire
Smith Katzenstein & Jenkins LLP
1000 North West Street, Suite 1501
Wilmington, DE 19801

Re: *In re Investors Bancorp, Inc. Stockholder Litigation*
C.A. No. 12327-VCS
Date Submitted: August 5, 2016

Dear Counsel:

The board of directors of Investors Bancorp, Inc. ("Investors Bancorp" or the "Company"), comprised of ten non-employee directors and two executive officers, granted themselves substantial compensation in the form of stock awards following the completion of a mutual to stock public offering in mid-2014. The Company announced the compensation plan in a Schedule 14A Proxy Statement issued on April 14, 2016. Shortly thereafter, five plaintiffs, Michael Logan, Ronald Raganella, Andrew Kaufman, Robert Elburn and Dieter Soehnel, filed three separate Verified Stockholder Derivative Complaints against the members of

the Investors Bancorp board alleging that the directors breached their fiduciary duties by awarding themselves grossly excessive compensation. Logan is represented by the law firms of Friedlander & Gorris, PA ("F&G") and Levi & Korsinsky, LLP ("L&K"); Raganella and Kaufman are represented by the law firms of F&G and Berman DeValerio ("B&D"); and Elburn and Soehnel are represented by the law firms of Smith Katzenstein & Jenkins LLP ("SKJ") and Purcell Julie & Lefkowitz LLP ("PJL").

Unable to agree on a leadership structure, the parties and their counsel have filed competing motions to appoint lead plaintiffs and lead counsel.[1] For reasons I articulated at the conclusion of the hearing on these cross motions, and need not repeat here, I have determined that it is not in the best interests of the Company or its stockholders to appoint all of the law firms competing for leadership as co-lead counsel. Consequently, I am left to choose lead counsel as between highly skilled attorneys who have all distinguished themselves in the field of stockholder litigation. Under these circumstances, there is no clearly right answer.

---

[1] To be precise, Kaufman, Logan and Raganella have moved the Court for an order appointing them as co-lead plaintiffs and F&G and L&K as co-lead counsel (with B&D named as "additional counsel"). Elburn and Soehnel have moved for an order appointing them as co-lead plaintiffs and SKJ and PJL as co-lead counsel.

The Court's analysis is guided by the *Hirt* factors, so named because they were first identified in this form by Vice Chancellor Lamb in *Hirt v. U.S. Timberlands Service Co.*[2] They are:

> • The quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs;

> • [T]he relative economic stakes of the competing litigants in the outcome of the lawsuit (to be accorded "great weight");

> • [T]he willingness and ability of all the contestants to litigate vigorously on behalf of an entire class of shareholders;

> • [T]he absence of any conflict between larger, often institutional, stockholders and smaller stockholders;

> • [T]he enthusiasm or vigor with which the various contestants have prosecuted the lawsuit; [and]

> • [The] competence of counsel and their access to the resources necessary to prosecute the claims at issue.[3]

Of course, every case is unique and the facts that generate the controversy over the appointment of lead plaintiff and counsel in representative litigation will

---

[2] 2002 WL 1558342, at *2 (Del. Ch. July 3, 2002) (drawing heavily from Chancellor Chandler's decision in *TWC Tech. Ltd. P'ship v. Intermedia Commc'ns., Inc.*, 2000 WL 1654504, at *4 (Del. Ch. Oct. 17, 2000)).

[3] *Id.* (footnotes and internal quotation marks omitted).

often cause the Court to dwell on certain of the *Hirt* factors while glossing over others. This "nuanced and case-specific" manner in which the Court approaches the appointment process helps to ensure that the Court achieves its ultimate goal of establishing "a leadership structure that will provide effective representation" and best serve the interests of the company and its stockholders.[4] I will address the *Hirt* factors that have informed my decision *seriatim* and in ascending order of relevance to these facts.

**The Competence of Counsel**

As noted, all counsel involved in this dispute are highly competent. Indeed, they are among the cream of the crop of lawyers who have dedicated their practices to representing stockholders in corporate governance disputes. Nevertheless, if this was the sole and dispositive factor, the scale would tip in favor of the L&K/F&G team. Their track records are extraordinary and their collective experience in representative litigation exceeds that of the PJL/SKJ team. But this is not the only factor and, in this case, it is not the most persuasive factor.

---

[4] *In re Del Monte Foods Co. S'holders Litig.*, 2010 WL 5550677, at *6 (Del. Ch. Dec. 31, 2010); *see also In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 424886, at *1 (Del. Ch. Feb. 7, 2012) ("[E]ach factor is given weight only to the extent that it bears on the ultimate question of what is in the best interests of the plaintiff class.").

**The Relative Economic Stakes of the Competing Litigants**

*Hirt* instructs that the Court is to give this factor "great weight."[5] The premise underlying this factor is that a plaintiff with a greater stake in the outcome is more likely to participate actively in the litigation and to monitor more carefully his counsel's prosecution of the action.[6] The factor is given less weight, however, when neither of the competing plaintiffs' "stake is . . . large enough to demonstrate a substantial relative difference" that would allow the Court to conclude that one plaintiff will press the case more diligently than the other.[7]

Investors Bancorp has 139,666,833 total outstanding shares. Three of the plaintiffs have submitted affidavits in which they state their "stake" in the Company.[8] Logan owns 5,689 shares worth $63,204. This represents 100% of his stock portfolio and 30% of his combined stock and mutual fund holdings. It represents approximately .0041% of the outstanding stock of the Company.

---

[5] *Hirt*, 2002 WL 1558342, at *2.

[6] *Wiehl v. Eon Labs*, 2005 WL 696764, at *3 (Del. Ch. Mar. 22, 2005).

[7] *Id.*

[8] It is alleged in the Elburn/Soehnel complaint, at ¶13, that Soehnel owns "100 shares of Investors Bancorp common stock"; it is alleged in the Kaufman/ Logan second amended complaint, at ¶9, that Kaufman "owns 3,021 shares of the Company's common stock."

Raganella owns 51,096 shares worth $587,604, representing approximately 8% of his investment portfolio and .037% of the total outstanding stock of the Company. Elburn owns 5,170 shares worth approximately $59,455, representing approximately 10% of his investment portfolio and .0037% of the total outstanding stock of the Company.

While Raganella by far has the largest investment in the Company, and Logan has the most to gain or lose in the litigation relative to the percentage of his investment funds tied up in the Company, all of the putative lead plaintiffs have significant investments at stake in this litigation and presumably all of them would have incentive to participate in and monitor the progress of this litigation. Thus, even though this factor favors the Kaufman, Logan and Raganella application, none of the stock holdings among the plaintiffs are large or small enough to "demonstrate a substantial relative difference" that would require the Court to give this factor great weight under *Hirt*.[9]

---

[9] *Id.*

**The Enthusiasm and Vigor of Prosecution**

All counsel have demonstrated enthusiasm and vigor in the prosecution of the action thus far and, if history is a guide, I have no doubt that lawyers on both teams would continue to press the claims skillfully and with avidity after the leadership structure is decided. The SKJ/PJL team, however, has worked the case up more thoroughly and aggressively to date.

Soehnel retained PJL on April 28, 2016, approximately two weeks after Investors Bancorp issued the proxy statement in which it first announced the awards of compensation at issue in this litigation. Elburn retained PJL on May 5, 2016. Consistent with prior guidance from our Supreme Court and from this Court, PJL served the Investors Bancorp board of directors with demands for books and records pursuant to 8 *Del. C.* § 220 ("Section 220") on May 2 (on behalf of Soehnel) and May 5 (on behalf of Elburn) as a means to investigate potential derivative claims on behalf of the Company.[10] The Company responded on May 9 and May 16, respectively, by agreeing to produce the requested documents.

---

[10] *See Rales v. Blasband*, 634 A.2d 927, 934–35 (Del. 1993) (noting the importance of utilizing the "tools at hand," including books and records demands, to investigate derivative complaints in order to overcome the pleading burdens imposed by Court of

After confidentiality agreements were in place, the Company produced approximately 1,500 pages of documents on May 31, 2016. PJL and SKJ filed their derivative complaint for plaintiffs Elburn and Soehnel one week later, on June 7, 2016. As discussed below, it is evident on the face of their complaint that counsel utilized the documents received from the Section 220 demand extensively to support their clients' factual allegations.

L&K and F&G chose not to make a Section 220 demand on behalf of their clients. Instead, as they explain it, they chose to use other "tools at hand" to investigate their derivative claims, including press reports and the Company's public SEC filings.[11] They are critical of PJL's decision to pursue books and records because the public filings were more than adequate to tell the story of the excessive compensation. The Company's books and records, therefore, were not

---

Chancery Rule 23.1); *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 356 (Del. Ch. 2010), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011) ("For years, our Supreme Court has made clear that derivative plaintiffs should seek books and records and otherwise conduct an adequate investigation into demand excusal *before* rushing off to file a derivative complaint.").

[11] *See Rales*, 634 A.2d at 934–35 & n.10 (noting that among the "tools at hand" available to the derivative plaintiff are "a variety of public sources from which the details of a corporate act may be discovered, including the media and governmental agencies such as the Securities and Exchange Commission").

needed to state the case. Moreover, the demand might well have led to prejudicial delay if the Company balked at producing documents or, worse, forced Section 220 litigation. They also note that the Company could have placed onerous conditions on the production of documents that could have minimized the utility of any documents produced or otherwise disadvantaged the plaintiffs in this litigation. Finally, they argue that the Court should be wary of placing too much weight on the PJL books and records demand for fear that doing so might send a message that a less compelling case for leadership will always be enhanced if counsel, as a matter of course, regardless of utility or risk, begins the representation with a Section 220 books and records demand.

Of course, none of the risks identified by the L&K/F&G team materialized. Nevertheless, I acknowledge that the tool of the books and records demand, in the hands of less skilled counsel, might have caused more harm than good. In this case, however, I am satisfied that the PJL/SKJ team knew how to wield the tool while managing inherent risks so that the fruits of the effort could be exploited in

the form of a superior complaint.[12]  And, as explained below, that is precisely what happened in this case.

**The Quality of the Pleadings**

There can be no one question that, especially with regard to representative actions, Delaware courts recognize a "public policy interest favoring the submission of thoughtful, well-researched complaints—rather than ones regurgitating the morning's financial press."[13]  To that end, this Court recognizes the relative quality of the pleadings as an important factor to consider when competing counsel are vying for a leadership position.[14]  "[W]here one complaint is stronger than another, this Court will not discount that complaint's strength on the grounds that the 'other plaintiffs' counsel could amend their complaints to

---

[12] I note that none of the plaintiffs have moved for expedited proceedings.  Even so, if the PJL/SKJ team sensed the Company was delaying production of books and records in an effort to prejudice the prosecution of the underlying claims, or was imposing unreasonable conditions on the production of documents, counsel easily could have abandoned the Section 220 demand and filed their derivative complaint with the information they could glean from the public record.

[13] *Biondi v. Scrushy*, 820 A.2d 1148, 1162 (Del. Ch. 2003).

[14] *Delphi*, 2012 WL 424886, at *2 (observing that the quality of the complaint is a predictor for a more likely successful outcome and is a reflection of the "competence and investigative diligence of the counsel who filed it").

incorporate its allegations.'"[15]    Any such orientation would undoubtedly "diminish[] the incentive for the lawyer filing the superior complaint to diligently investigate and plead good cases in the future."[16]

Both complaints reflect investigative effort and the craftsmanship expected of competent plaintiff's counsel engaged in representative litigation in this Court.[17] The complaint filed by the PJL/SKJ team, however, is superior.   The bigger complaint is not always the better complaint.   Nevertheless, it cannot escape notice that the PJL/SKJ complaint is nearly twice as long as the complaint filed by L&K/F&G.   In this case, the additional content is not fluff.   Rather, PJL/SKJ utilized documents they obtained in their books and records demands, including board and compensation committee meeting minutes, to provide meaningful, additional factual support for their allegations.

---

[15] *Id.* (quoting *Del Monte*, 2010 WL 5550677, at *9).

[16] *Id.* (citing *Del Monte*, 2010 WL 5550677, at *9).

[17] I note that the competing complaints reveal that the attorneys would pursue essentially the same legal theories (breach of fiduciary duty and unjust enrichment) to challenge the allegedly excessive compensation awards.  The difference between the complaints is the extent of the factual detail offered to support these claims.

This is especially so with regard to Elburn and Soehnel's claim that the approval of excessive compensation for the executive directors was part of a single, interrelated, self-interested transaction, along with the approval of the non-employee director compensation, such that both awards should be subject to entire fairness review.[18] Absent the connection, the board's decision to approve employee compensation might be entitled to business judgment rule deference.[19] "In deciding whether to consider a sequence of transactions separately or collectively, the Court reviews the circumstances surrounding the challenged transactions, as alleged by the particularized facts of the complaint, to decide

---

[18] *See In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768 at *9 (Del. Ch. Jan. 10, 2003) (holding that the board's approval of non-employee director compensation is inherently self-interested such that it will be subject to entire fairness review, and that employee compensation will also be deemed self-interested if it is found to have been undertaken as part of an illicit *quid pro quo*); *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002) (holding that "director self-compensation decisions lie outside the business judgment rule's presumptive protection").

[19] *Nat'l Auto*, 2003 WL 139768, at *9–10. *See also Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (applying the business judgment rule to board's decision to award executive compensation). According to both sets of complaints, the awards of compensation to the executive directors were substantially larger than the awards to the non-employee directors.

whether it can be reasonably inferred that those transactions constituted a single, self-interested scheme."[20]

Using the fruits of their Section 220 demand, particularly meeting minutes, the PJL/SKJ complaint recites with significant detail the Investors Bancorp board's historical compensation awards to support allegations that the board's explanation that it had earned the substantial awards at issue here was a pretext for greed. The board minutes are also featured to support allegations that the board approved both the employee and non-employee director compensation awards as part of a self-interested, *quid pro quo* scheme. For their part, L&K/F&G rely principally upon the circumstantial evidence of temporal proximity to allege that both compensation awards are connected and reflective of an illicit *quid pro quo*.

I will not say at this point whether either or both complaints would survive the motion to dismiss that both sets of counsel predict is forthcoming. For now, it suffices to say that the PJL/SKJ complaint provides more factual fodder for counsel to work with should they be called to defend their pleading against alleged failures to meet the more precise pleading standards contemplated by Rule 23.1 or

---

[20] *Nat'l Auto*, 2003 WL 139768 at *9.

to overcome the presumptions associated with application of the business judgment rule.[21]

After balancing the *Hirt* factors, I find that the vigor of prosecution demonstrated by PJL and SKJ thus far, and the resulting superior quality of their pleading, qualifies Elburn and Soehnel to serve as lead plaintiffs and PJL/SKJ to act as co-lead counsel in this case. Accordingly, I have entered an order establishing this leadership structure.

Very truly yours,

*/s/ Joseph R. Slights III*

JRSIII/cap
cc:   Kenneth J. Nachbar, Esquire
      Register in Chancery-K

---

[21] *Id.* at \*7–8.