# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK LAVIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 2017-0547-JRS** |
| | : | |
| WEST CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## OPINION

Date Submitted: October 9, 2017
Date Decided: December 29, 2017

Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware; Randall J. Baron, Esquire and David T. Wissbroecker, Esquire of Robbins Geller Rudman & Dowd LLP, San Diego, California; Christopher H. Lyons, Esquire of Robbins Geller Rudman & Dowd LLP, Nashville, Tennessee; and W. Scott Holleman, Esquire of Johnson Fistel, LLP, New York, New York, Attorneys for Plaintiff.

Kevin R. Shannon, Esquire, Christopher N. Kelly, Esquire and Daniel M. Rusk, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Walter C. Carlson, Esquire, Nilofer I. Umar, Esquire, and Elizabeth Y. Austin, Esquire of Sidley Austin LLP, Chicago, Illinois, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

In early 2016, West Corporation ("West" or the "Company") began to consider strategic alternatives, including a possible sale of the Company or its business segments. The Company initiated a formal sales process later that year and continued with that process through the spring of 2017. Ultimately, West entered into an Agreement and Plan of Merger (the "Merger Agreement") with affiliates of Apollo Global Management on May 9, 2017, wherein Apollo agreed to purchase West's outstanding stock at $23.50 per share in cash (the "Merger"). On June 27, 2017, the Company distributed its Schedule 14A Proxy Statement (the "Proxy") to its stockholders in which it solicited their votes in favor of the Merger. One month later, the overwhelming majority of West's stockholders voted to approve the Merger and it was consummated shortly thereafter.

On July 19, 2017, Plaintiff, Mark Lavin, served a demand upon West to inspect its books and records under Section 220 of the Delaware General Corporation Law ("DGCL").[1] In his demand, Lavin stated that his purpose was to "determine whether wrongdoing and mismanagement had taken place" in connection with the Merger and "to investigate the independence and disinterestedness" of the Company's directors.[2] Soon after, West rejected Lavin's

---

[1] 8 *Del. C.* § 220.

[2] JX 3 (Lavin's Demand to Inspect Books and Records) at 7.

1

demand for failure to state a proper purpose for inspection and because the demand was overly broad.

Lavin filed his Verified Complaint to Compel Inspection on July 27, 2017 (the day after the stockholders voted to approve the Merger). In its answer to the Complaint, West reiterated its position that inspection was not justified because Lavin could not, as a matter of law, articulate a credible basis of wrongdoing against West's board of directors (the "Board"). In this regard, West maintained that not only did the Board behave reasonably in recommending the Merger as a matter of law, West's disinterested stockholders approved that recommendation in a fully informed, uncoerced vote. According to West, under the so-called *Corwin* doctrine,[3] the stockholder vote "cleansed" any purported breaches of fiduciary duty and, therefore, Lavin may challenge the Merger only on grounds of waste (which he has not stated as a basis for inspection).[4]

The parties agreed that the trial of this matter would be limited to a "paper record" without deposition or live testimony. After carefully reviewing the evidence and the arguments of counsel, I conclude in this post-trial opinion that Lavin has demonstrated, by a preponderance of the evidence, a credible basis from which the

---

[3] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[4] JX 4 (West's Response to Lavin's Demand) at 3.

Court can infer that wrongdoing related to the Merger may have occurred.  In so finding, I reject, as a matter of law, West's argument that *Corwin* will stand as an impediment to an otherwise properly supported demand for inspection under Section 220.  Any contrary finding would invite defendants improperly to draw the court into adjudicating merits defenses to potential underlying claims in order to defeat otherwise properly supported Section 220 demands.  Equally compelling, the Court should not (and will not here) prematurely adjudicate a *Corwin* defense when to do so might deprive a putative stockholder plaintiff of the ability to use Section 220 as a means to enhance the quality of his pleading in a circumstance where precise pleading, under our law, is at a premium.

Judgment is entered for Lavin.  West shall produce for inspection the books and records designated herein as essential to Lavin's pursuit of his proper purpose.

## I.  FACTUAL BACKGROUND

The Court held trial on a paper record on October 9, 2017.  I have drawn the facts from the trial exhibits and those matters of which the Court may take judicial notice.  Unless noted otherwise, the following facts were proven by a preponderance of the evidence.

3

## A. The Parties

Plaintiff, Mark Lavin, is a West shareholder who has continuously owned his West common stock since at least June 1, 2017.[5] Defendant, West, is a Delaware corporation with its principal place of business in Omaha, Nebraska.

## B. West's Business

West is a global provider of communication and network infrastructure services. It provides voice and data services through four "reporting segments": Unified Communications Services ("UC"), Safety Services, Interactive Services and Specialized Agent Services.[6] UC has two separate "operating segments": (1) Unified Communications ("UCaaS") and Telecom; and (2) Conferencing.[7]

UC is West's largest reporting segment, accounting for approximately 62% of the Company's total revenue and 61% of its total operating income.[8] Of UC's two operating segments, Conferencing is by far the largest, accounting for approximately

---

[5] Lavin attached to his Verified Complaint a Charles Schwab statement showing his holdings as of June 1, 2017, which included 3,320 shares of West common stock. JX 3 (Lavin's Demand to Inspect Books and Records). West does not dispute that Lavin is and has been a stockholder at all relevant times.

[6] JX 5 (West Sched. 14A Definitive Proxy Statement filed June 27, 2017 (the "Proxy")) at 19.

[7] *See* JX 16 (West Form 8-K filed on Feb. 19, 2016) at 15, 18; JX 6 (Wells Fargo Equity Research on West Corporation dated Feb. 28, 2017 ("Wells Fargo Report")).

[8] JX 5 (Proxy) at 19; JX 6 (Wells Fargo Report); JX 16 (West Form 8-K) at 15, 18.

50% of West's overall revenue.[9]  The Conferencing segment, not surprisingly, concentrates on facilitating audio, webcast and other conferencing capabilities in virtual environments, while the UCaaS segment provides direct IP connectivity and internet platforms.[10]

West's remaining reporting segments, discussed below, range between approximately 10% and 12% of West's annual revenue.[11]  The Safety Services segment includes, *inter alia*, "next generation 9-1-1," which routes a 9-1-1 caller's physical location to specific public-safety answering points.[12]  The Interactive Services segment includes outbound notification systems (voice, text/SMS and chat), inbound speech solutions, cloud contract center technologies, and web, mobile and professional services.[13]  Lastly, the Specialized Agent Services segment includes healthcare advocacy services, cost management services and revenue generation services.[14]

---

[9] JX 6 (Wells Fargo Report).  It appears from the Proxy that the UC Segment, and Conferencing in particular, was not doing as well as expected towards the end of 2016, which was about the time that West announced it was pursuing strategic alternatives.  JX 5 (Proxy) at 30.

[10] JX 16 (West Form 8-K) at 19.

[11] JX 16 (West Form 8-K) at 5, 28, 34, 40.

[12] JX 16 (West Form 8-K) at 32.

[13] JX 16 (West Form 8-K) at 33–38.

[14] JX 16 (West Form 8-K) at 39–46.

5

## C. West's Major Shareholders and Board Composition

Mary West and Gary West (the "Founders") established West in 1986. The Company was publicly traded from 1996 until 2006, when it completed a leveraged recapitalization sponsored by two private equity funds, Thomas H. Lee Partners, L.P. ("TH Lee") and Quadrangle Group LLC ("Quadrangle").[15] Thereafter, in October 2006, TH Lee and Quadrangle purchased the Company's publicly traded securities for cash in a going-private transaction.[16] As of 2013, TH Lee and Quadrangle collectively owned approximately 70% of West's common stock. The Company went public for a second time in March 2013.[17] As a result of this public offering, TH Lee's holdings were diluted to 43.5% and Quadrangle's holdings were diluted to 9.1%.[18]

At the same time TH Lee and Quadrangle took the Company public in 2013, they entered into a stockholder agreement with the Founders and the Company, whereby the parties agreed that if Quadrangle maintained at least 25% of the shares it held as of the March 2013 IPO date, then it would retain the right to elect one

---

[15] JX 17 (West's Form 10-K Annual Report filed on Feb. 16, 2017) at 3. In this Opinion, TH Lee and Quadrangle are used to refer both to those specific entities and those entities when acting in combination with their affiliates.

[16] JX 17 (West's Form 10-K Annual Report filed Feb. 16, 2017) at 3.

[17] JX 17 (West's Form 10-K Annual Report filed Feb. 16, 2017) at 4.

[18] JX 9 (West's Prospectus filed on Mar. 22, 2013) at 108.

director.[19]  For its part, TH Lee bargained for a right to elect up to four directors so long as it held more than 50% of the shares held as of the IPO date.[20]  Together, TH Lee and Quadrangle reserved the right to elect half of West's ten-member board.[21]

Leading up to the Merger, the Board was comprised of Lee Adrean, Thomas B. Barker (West's Chairman and CEO), Donald M. Casey, Jr., Anthony J. DiNovi, Paul R. Garcia, Laura A. Grattan, Jeanette A. Horan, Michael A. Huber, Diane E. Offereins and Gregory T. Sloma.[22]  Quadrangle designated Huber, its president and managing principal.  TH Lee designated DiNovi and Grattan, its co-president and managing director, respectively.  West has represented in its SEC filings that Sloma and Garcia are independent directors, but they were designated to

---

[19] JX 7 (Amended and Restated S'holder Agreement ("S'holder Agreement")) at 2 ("For so long as the Quadrangle Investors own at least twenty-five percent (25%) of the Shares listed as being owned by the Quadrangle Investors on Schedule I, the Quadrangle Investors will be entitled to designate one (1) director.").

[20] JX 7 (S'holder Agreement) at 3 ("For so long as the THL Investors own at least five percent (5%) of the Shares listed as being owned by the THL Investors on Schedule I, the THL Investors will be entitled to designate a number of directors as determined under Section 2.1.3."); *id.* § 2.1.3 ("The initial number of THL Directors is four (4), but the number of directors that THL Investors are entitled to designate will automatically be reduced effective at and after such time as the THL Investors cease to hold Shares constituting the requisite percentage of the Shares listed as being owned by the THL Investors [on the following schedule] . . . [If THL maintains more than 50% of its holdings, it may designate 4 directors].").

[21] JX 7 (S'holder Agreement) at 2–3.

[22] JX 5 (Proxy) at 58–59; JX 8 (Annual Meeting Proxy) at 6–9.

the Board just before the 2013 IPO when TH Lee and Quadrangle controlled the Company.[23]

According to West, Nasdaq Marketplace Rule 5605(b)(1) required the Board to be comprised of a majority of independent directors in order for West to remain a "non-controlled company," which ostensibly was its status at the time of the Merger.[24] Although West claims that the majority of the Board was independent,[25] it concedes that TH Lee and Quadrangle could still exercise their contractual rights under the Stockholder Agreement to appoint five of the Company's ten directors throughout the sales process and at the time of the Merger.[26]

As TH Lee's and Quadrangle's investment in West approached its eight-year mark, they began to liquidate their holdings. Starting in February 2014, the funds initiated a plan to reduce their holdings that eventually included two secondary offerings, one in March 2015 and the other in June 2015.[27] After each offering,

---

[23] JX 9 (West's Prospectus filed on Mar. 22, 2013) at 10, 80.

[24] *See, e.g.*, JX 10 (West's March 2015 Secondary Offering Prospectus Supplement) at S-14; JX 24 (West's Form 8-K filed on Dec. 14, 2015).

[25] *See* Def. West's Reply Br. 11–12 ("West's Board determined that six of its ten Board members (*i.e.*, all of the directors except for West's CEO, the two THL designees, and the one Quadrangle designee) were independent.").

[26] Tr. at 81:1–6 ("[W]e don't dispute this. I mean, this provides that TH Lee has the right to appoint up to four individuals on West's board of directors.").

[27] JX 10 (March 2015 Secondary Offering Prospectus); JX 11 (June 2015 Secondary Offering Prospectus).

West's stock price dropped substantially.[28] Despite selling a large percentage of their holdings, TH Lee and Quadrangle still held enough stock to maintain their full rights to appoint directors under the Shareholder Agreement.[29]

### D. West Considers Strategic Alternatives, Evaluates Bidders and Selects Apollo

In September 2015, West and TH Lee began to receive unsolicited expressions of interest from third parties regarding possible acquisitions of one or more of the Company's business segments.[30] The following year, in November 2016, the Board announced that it was considering strategic transactions. According to the Proxy, from September 2015 through December 2016, at least thirteen third parties approached West or TH Lee expressing an interest in acquiring either one or more business segments or the whole Company.[31] Indeed, during this time, West received an indication of interest for each segment of the Company.[32]

---

[28] JX 12 (Yahoo! Finance Chart of West Stock Price from March 25, 2013 to September 5, 2017 ("Yahoo! Finance Chart")).

[29] JX 5 (Proxy) at 107; JX 7 (S'holder Agreement) at 2–3. As of the date of the Merger, TH Lee owned approximately 21.3% of the Company's shares (18,176,133 shares), and Quadrangle owned approximately 4.4% of its outstanding shares (3,781,961 shares). *See also* JX 8 (Annual Meeting Proxy) at 5.

[30] JX 5 (Proxy) at 28–32.

[31] JX 5 (Proxy) at 28–32.

[32] *E.g.*, JX 5 (Proxy) at 32 ("With respect to the Preliminary Indications of Interest contemplating a Potential Segment Acquisition, Party A's Preliminary Indication of Interest contemplated an acquisition of the **Safety Services segment** . . . . Party G's

West selected Centerview as its financial advisor in April 2016. Centerview's engagement provided for a contingency fee arrangement whereby it would receive a modest flat fee for its work but could earn up to $28 million *if* the Company consummated the Merger.[33] The Proxy indicates that Centerview contacted fifty-five potential bidders and that West executed confidentiality agreements with thirty different parties.[34]

By January 2017, the Board instructed Centerview and management to "focus" on a sale of the Company as a whole.[35] After the Board decided to prioritize a whole-company sale, two bidders, "Party H" and "Party L," made an offer to purchase certain business segments for substantial consideration. Specifically, Party H offered between $2.4 billion and $2.6 billion for all segments excluding the

---

Preliminary Indication of Interest contemplated an acquisition of the **Interactive Services segment** . . . . Party J's Preliminary Indication of Interest contemplated an acquisition of the **Specialized Agent Services segment** . . . . Party K's Preliminary Indication of Interest contemplated an acquisition of the **Unified Communications Services segment** for $2.3 billion.") (emphasis supplied). The Proxy indicates that the Company received several more indications of interest and bids not specifically described therein. JX 5 (Proxy) at 32–35.

[33] JX 5 (Proxy) at 56 ("In connection with Centerview's services as the financial advisor to the Board, the Company has agreed to pay Centerview an estimated aggregate fee of $28 million, $2 million of which was payable upon the rendering of Centerview's opinion and the remainder of which is payable contingent upon consummation of the Transaction.").

[34] JX 5 (Proxy) at 35.

[35] JX 5 (Proxy) at 33.

UC segment.[36] Party L made an offer to purchase the Interactive Services and Safety Services segments, along with assets from the Specialized Agent Services segment, for $2.36 billion.[37]

According to the Proxy, West granted only Apollo, Party H, Party L and one other party access to its data room.[38] Thereafter, the Board began negotiating exclusively with Apollo.[39] On May 9, 2017, West and Apollo signed the Merger Agreement, wherein Apollo agreed to acquire the Company for $23.50 per share, which equates to approximately $2 billion in cash or $5.2 billion in enterprise value taking into account West's long-term debt of approximately $3.2 billion.[40]

The Merger Agreement contained a no-shop provision with a fiduciary out that at least arguably made it more difficult for a sale of the Company's segments to

---

[36] JX 5 (Proxy) at 35.

[37] JX 5 (Proxy) at 35.

[38] It appears from the Proxy that Apollo, Party H and Party F (together with "Party I") were provided access to the data room on January 21, 2017, and Party L was provided access on March 2, 2017. JX 5 (Proxy) at 33–34.

[39] JX 5 (Proxy) at 36–39.

[40] JX 5 (Proxy) at 28, 41; JX 17 (West's Form 10-K Annual Report filed Feb. 16, 2017) at 29. TH Lee, Quadrangle and the Founders entered into voting agreements with Apollo, obligating them to "vote their shares of West common stock in favor of the proposal to adopt the merger agreement. As of the close of business on the record date, these stockholders and their affiliates beneficially owned, in the aggregate, approximately 46% of our common stock." JX 5 (Proxy) at 4, 110.

occur.[41]  According to the Merger Agreement, the Board could terminate the deal with Apollo in favor of another transaction only if it received a "Superior Proposal," which was defined as a proposal to acquire at least 70% of West's assets, revenue or shares.[42]  Because West's largest segment, the UC segment, accounted for approximately 62% of West's revenue, the no-shop could have shut out an offer for one or more segments even if the offer was substantially greater than Apollo's.

West filed the Proxy soliciting votes in favor of the Merger on June 27, 2017.[43] Within a few days, five putative class action complaints were filed in the U.S. District Court for the District of Nebraska, primarily alleging federal securities law violations and claiming that the Proxy contained material omissions.[44]  West responded by filing a supplement to the Proxy thereby mooting the disclosure claims

---

[41] JX 5 (Proxy) at 8, 85–87.

[42] JX 5 (Proxy) at 8, 85–87.

[43] JX 5 (Proxy).

[44] *Scarantino v. West Corp.*, No. 4:17-cv-03080 (D. Neb.); *Wyant v. West Corp.*, 4:17-cv-03081 (D. Neb.); *Wilson v. West Corp.*, Case No. 8:17-cv-00228 (D. Neb.); *Bushansky v. West Corp.*, Case No. 4:17-cv-03083 (D. Neb.); *Katz v. West Corp.*, Case No. 4:17-cv-03084 (D. Neb.) (the "Nebraska Actions").

in advance of the stockholder vote.[45]  On July 26, 2017, approximately 86% of the outstanding shares voted and, of those, 99.8% voted in favor of the Merger.[46]

In connection with the transaction, Barker (the Chairman and CEO) was set to receive a $19-million "golden parachute" comprised of a $7.5 million cash award and $11.5 million for accelerated vesting of restricted stock, in addition to another $9 million in cash for vested stock options and notional shares.[47]  West's non-employee directors were set to receive a $100,000 cash award in addition to accelerated vesting of restricted stock units worth approximately $100,000.[48]  West's other high-level officers also were to receive "golden parachutes."[49]

### E.  Lavin Makes a Section 220 Demand

On July 19, 2017, Lavin sent his demand to inspect West's books and records under Section 220 of the DGCL.  His stated purpose was to "determine whether

---

[45] JX 25 (West Form 8-K filed on July 19, 2017).  It is not clear from the record whether the Nebraska Actions are pending or, if resolved, how they were resolved.

[46] JX 13 (West Form 8-K filed July 27, 2017) at 2.  The Merger closed on October 10, 2017.  West has not challenged Lavin's standing to pursue his Section 220 claim.

[47] JX 5 (Proxy) at 63 (showing Golden Parachute Payment of $19,187,530); *id.* at 59 (showing Executive Officer Vested Equity Awards).

[48] JX 5 (Proxy) at 58.  DiNovi, Grattan and Huber, TH Lee's and Quadrangle's designees, were excluded from these awards.  *Id.*

[49] JX 5 (Proxy) at 63 (listing "Golden Parachute Payments" to four officers other than Barker).  I note that final argument in this case was presented the day before the Merger closed so the record does not reflect whether any of the golden parachute payments were actually made as scheduled.

13

wrongdoing and mismanagement had taken place" in connection with the Merger and "to investigate the independence and disinterestedness" of the Company's directors.[50] Lavin listed thirteen categories of books and records for inspection. West rejected the demand on July 26, 2017, on the grounds that Lavin had not articulated a credible basis for suspecting wrongdoing and had made an overbroad inspection demand in any event.[51]

### F. Procedural History

On July 27, 2017, Lavin filed a Verified Complaint to Compel Inspection of Books and Records under Section 220. The parties stipulated to a trial on a paper record,[52] and the Court conducted that trial on October 9, 2017. This is the Court's post-trial decision.

## II. ANALYSIS

Lavin argues that he has presented sufficient evidence from which the Court can infer that West's directors, for self-interested reasons, favored a less valuable sale of the Company over a more valuable sale of its parts. Specifically, he contends that the evidence supports an inference that (1) the Board knew that the most value-maximizing option was a sale of the Company's business segments; (2) a more

---

[50] JX 3 (Lavin's Demand to Inspect Books and Records) at 7.

[51] JX 4 (West's Response to Lavin's Demand) at 2–5.

[52] Stipulation and Scheduling Order (Aug. 17, 2017).

valuable sale of the segments was possible given that multiple bidders made substantial offers for each of West's segments; and (3) unlike a sale of the Company, a sale of segments would not provide personal benefits for the directors and senior management, nor would it provide TH Lee and Quadrangle with much needed liquidity.[53] Lavin also argues that Centerview suffered from conflicts of interest that caused it improperly to favor the deal with Apollo. This, he contends, provides at least a credible basis to infer that West's directors and officers may have favored an inadequate bidder, and thus may have breached their *Revlon* duties, possibly in bad faith.[54]

Lavin also argues that the Board failed to disclose material information in the Proxy. Specifically, he alleges that the Proxy omits financial growth profiles of West's operating segments, sum-of-the-parts analyses that Centerview may have performed, relevant relationships that certain directors have with TH Lee and Quadrangle and the "seriousness" of the partial-company/segment bidders. Lavin

---

[53] As is common, the "liquidity" argument reduces to a contention that the private equity funds were nearing their investment horizons and pursued a quick liquidity event that would take out their entire investment in West rather than piecemeal sales of segments that would take more time to close and may cause the funds to be extended beyond their horizons.

[54] *See In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *9–10 (Del. Ch. Jan. 3, 2013) (holding that the plaintiff stated a claim that the defendants breached their *Revlon* duties in bad faith); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989) (observing that an "auction was clandestinely and impermissibly skewed in favor" of management's preferred bidder).

raises these disclosure allegations as an independent basis for inspection and as a response to West's *Corwin* defense.

West responds that Lavin has failed to state a credible basis from which the Court can infer that (1) the directors approved the Merger for self-interested reasons or (2) Centerview suffered from disabling conflicts of interest. In framing its argument, West separates Lavin's disclosure allegations from his process allegations. As to the disclosure allegations, West argues that our courts routinely find that the kinds of "tell me more," "tell me why," or "tell me more about why" disclosure allegations identified by Lavin fail to state actionable disclosure claims. As to the process allegations, West argues that *Corwin* applies because a majority of disinterested, informed, uncoerced stockholders approved the Merger. According to West, this should end the inquiry. If the Court looks beyond the *Corwin* "cleansing," West contends that the Proxy clearly reveals that the deal process was sound and not tainted by conflicts of interest.

For reasons discussed below, I am satisfied that Lavin has presented a credible basis from which the Court can infer that West's directors and officers may have breached their fiduciary duties in favoring a sale of the Company as opposed to a sale of its segments. In this regard, I reject West's argument that "*Corwin* provides the framework" for determining whether Lavin has met his burden to justify

inspection.[55]  As for the substance of Lavin's claims of wrongdoing, the evidence he presented in support of his process claims clears the very low bar set by the "credible basis" standard of proof.[56]  His demand is too broad, however, and must be limited to the books and records that are necessary and proper to assist him in pursuing his investigation.

## A.  The Section 220 Standard

The standard for evaluating a demand for books and records under Section 220 is well settled.  A stockholder of a Delaware corporation may inspect the corporation's books and records for any "proper purpose" reasonably related to the stockholder's "interest as a stockholder."[57]  The desire to investigate

---

[55] Def. West's Opening Br. 24; Def. West's Answering Br. 5 ("[T]he heightened *Corwin* standard provides the relevant framework under which to evaluate Plaintiff's process-based claims.").

[56] As noted, Lavin raised his disclosure claims as both an independent basis for inspection and as a response to West's *Corwin* argument.  *See* Pl. Lavin's Answering Br. 1.  Because I find that *Corwin* does not apply to bar the claim for inspection, and that Lavin has presented a credible basis to infer wrongdoing related to the Merger process, I will not consider his disclosure allegations further.  For this reason, I likewise will not consider West's defenses to the disclosure allegations beyond observing that they improperly seek to immerse the Court in merits defenses in what is quintessentially a summary proceeding. *See* Def. West's Opening Br. 16–23.

[57] 8 *Del. C.* § 220(b) ("A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.").  West does not dispute that Lavin has satisfied the "form and manner requirements."  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775–76 (Del. Ch. 2016) (discussing "form and manner" requirements).

mismanagement or wrongdoing is a proper purpose.[58] To prove that the stated purpose is justified, the stockholder must demonstrate, by a preponderance of the evidence, "a credible basis from which the court can infer that mismanagement, waste or wrongdoing may have occurred."[59] The "credible basis" standard is the lowest burden of proof known in our law; it merely requires that the plaintiff present "some evidence" of wrongdoing.[60] "A plaintiff seeking inspection must also prove that 'each category of books and records requested is essential and sufficient to [its] stated purpose.'"[61]

## B. *Corwin* Will Not Impede an Otherwise Properly Supported Demand for Inspection

As stated, West maintains that Lavin must overcome its *Corwin* defense to prevail on his inspection demand because the Merger was approved by a fully informed, uncoerced vote of West's disinterested stockholders. For the reasons discussed below, I disagree. To explain why *Corwin* does not apply in the

---

[58] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) ("It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'").

[59] *Id.* at 118 (internal quotation marks omitted).

[60] *Id.* at 123 ("Although the threshold for a stockholder in a section 220 proceeding is not insubstantial, the 'credible basis' standard sets the lowest possible burden of proof.").

[61] *Henry v. Phixios Hldgs., Inc.*, 2017 WL 2928034, at *11 (Del. Ch. July 10, 2017) (quoting *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)).

Section 220 context, it is helpful first to revisit *Corwin*, this Court's faithful application of the doctrine and the pleading burdens it imposes upon the plaintiff who seeks to challenge a stockholder-approved merger or tender offer. With that context in mind, the legal and policy reasons for rejecting West's *Corwin* argument in this proceeding become clear.[62]

In *Corwin*, our Supreme Court clarified the "long-standing" principle that a voluntary, fully informed vote of disinterested stockholders to approve a transaction not involving a controlling stockholder will trigger the business judgment rule standard of review.[63] This now-settled doctrine recognizes a sound policy undergirding our corporate law: it is right to ratchet-down more intrusive judicial review, in order "to avoid the uncertainties and costs of judicial second-guessing, [in those instances where] the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[64] Given

---

[62] I assume in this Opinion, without deciding, that the Company has standing to raise a *Corwin* defense in this proceeding even though the defense is perhaps more properly viewed as belonging to the Company's board of directors. Neither party has raised the standing issue, so I decline to consider it further.

[63] 125 A.3d at 306, 312–14 & n.19.

[64] *Id.* at 313; *see also id.* ("When the real parties in interest—the disinterested equity owners—can easily protect themselves at the ballot box by simply voting no, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk taking than it promises in terms of benefits to them."); J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1457 (2014) (commenting that "a compromised board can substitute the stockholders as the necessary qualified decision maker and, thereby, restore

the overwhelming stockholder vote approving the Merger, and the full embrace

*Corwin* has received by our courts, Lavin is wise to expect that West will raise a

*Corwin* defense should he elect to challenge the transaction in a plenary action.

Mindful of the challenge(s) to come, Lavin has invoked Section 220 as a

means to investigate his potential claims before he launches his formal complaint.

Here again, he has proceeded wisely. Following *Corwin*, commentators and litigants

questioned whether the stockholder plaintiff or the fiduciary defendants bore the

burden at the pleading stage to demonstrate that the stockholder vote was (or was

not) fully informed and uncoerced.[65] Chancellor Bouchard recently provided the

definitive answer to the *Corwin* pleading burden question: the stockholder plaintiff

bears the burden of pleading facts that "identify a deficiency in the operative

disclosure document."[66] As Chancellor Bouchard explained, allocating the pleading

burden to the plaintiffs is "far more sensible" because the contrary rule would put

---

the protections of the business judgment rule" and that it is appropriate that "a court should take into account and defer to an uncoerced endorsement from fully informed, disinterested stockholders.").

[65] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7–8 (Del. Ch. Jan. 5, 2017).

[66] *Id. See also van der Fluit v. Yates*, 2017 WL 5953514, at *7 (Del. Ch. Nov. 30, 2017) ("[A] plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document.") (quoting *In re Solera Hldgs.*, 2017 WL 57839, at *8).

defendants in the "proverbially impossible position of proving a negative."[67]  Thus,

should the time come when Lavin must answer West's *Corwin* defense, he will be

obliged to do so with well-pled facts in his complaint that support a reasonable

inference that the stockholder vote was uninformed or coerced.  This is no easy

task.[68]

For over twenty years, Delaware courts have encouraged stockholders to use

the "tools at hand" (*e.g.*, Section 220) to gather information before filing complaints

that will be subject to heightened pleading standards.[69]  Although our courts

---

[67] *In re Solera Hldgs.*, 2017 WL 57839, at *8 (citing *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 890 n.36 (Del. Ch. 1999).  Chancellor Bouchard also observed that "[t]he logic of [placing the pleading burden on plaintiffs] is borne out by the reality that this is how ratification defenses in corporate sale transactions have been litigated in practice since *Corwin* was decided, including in this case." *Id.*

[68] *See* Matthew D. Cain, Jill E. Fisch, Steven Davidoff Solomon & Randall S. Thomas, *The Shifting Tides of Merger Litigation*, 71 Vand. L. Rev. (forthcoming 2018) (noting that *Corwin*, among other decisions, has "made the prosecution of merger litigation cases more difficult").  In the wake *Corwin*, this court has held stockholder plaintiffs to their pleading burden in a manner that reflects fealty to the laudable policy at the heart of the doctrine it solidified.  *See, e.g.*, *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 747 (Del. Ch. 2016) (granting motion to dismiss and noting that "[b]ecause stockholders representing a majority of Volcano's outstanding shares approved the Merger, Plaintiffs must plead facts from which it reasonably can be inferred that those stockholders were interested, coerced, or not fully informed in accepting the Tender Offer to avoid application of the business judgment rule."), *aff'd*, 156 A.3d 697 (TABLE); *Larkin v. Shah*, 2016 WL 4485447, at *20 (Del. Ch. Aug. 25, 2016) (dismissing complaint for failure to plead that the stockholder vote was coerced or uninformed); *In re Merge Healthcare Inc.*, 2017 WL 395981, at *13 (Del. Ch. Jan. 30, 2017) (same); *In re Solera Hldgs.*, 2017 WL 57839, at *13 (same); *Chester Cty. Ret. Sys. v. Collins*, 2016 WL 7117924, at *3 (Del. Ch. Dec. 6, 2016) (Order Granting Motions to Dismiss) (same).

[69] *E.g.*, *King v. VeriFone Hldgs., Inc.*, 994 A.2d 354, 356 (Del. Ch. 2010) ("For years, our Supreme Court has made clear that derivative plaintiffs should seek books and records and

primarily direct that encouragement (or admonition) to stockholders who intend to file derivative complaints where they will allege demand futility, the direction is equally applicable to stockholders who intend to file class action suits challenging transactions approved by a shareholder vote.[70] Indeed, it would be naïve to believe, in most instances, that the stockholder plaintiff will not face significant challenges to meet her pleading burden in anticipation of a *Corwin* defense if all she has in hand to prepare her complaint are the public filings of the company whose board of directors she proposes to sue.[71] That is precisely the dynamic that caused our courts

otherwise conduct an adequate investigation into demand excusal before rushing off to file a derivative complaint."), *rev'd on other grounds*, 12 A.3d 1140 (Del. 2011); *Seinfeld*, 909 A.2d at 120 ("The rise in books and records litigation is directly attributable to this Court's encouragement of stockholders, who can show a proper purpose, to use the 'tools at hand' to obtain the necessary information before filing a derivative action."); *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 571 (Del. 1997) ("[A] Section 220 proceeding may serve a salutary mission as a prelude to a derivative suit."); *Rales v. Blasband,* 634 A.2d 927, 934 n.10 (Del. 1993) (suggesting that stockholders use, *inter alia*, Section 220 as a means to gather information in anticipation of a derivative action).

[70] *See Compaq Comp. Corp. v. Horton,* 631 A.2d 1, 4 (Del. 1993) (holding that Section 220 may be employed by a stockholder investigating a direct claim just as readily as when the stockholder is investigating a derivative claim). To be sure, there are timing challenges posed in the context of utilizing Section 220 in aid of direct claims challenging a merger or tender offer transaction that typically do not exist in the derivative context. Even so, Section 220 still can serve its purpose in the merger or tender offer context if the stockholder moves promptly. *See e.g.*, *Cutlip v. CBA Int'l, Inc. I*, 1995 WL 694422, at *2–3 (Del. Ch. Oct. 27, 1995) (holding that plaintiffs did not lose standing to pursue a Section 220 action where they filed suit before the merger closed); *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *7–8 (Del. Ch. July 13, 2005) (same).

[71] *See* Joel Edan Friedlander, *Vindicating the Duty of Loyalty: Using Data Points of Successful Stockholder Litigation as a Tool for Reform,* 72 Bus. Law. 623, 644–48 (2017) (addressing concerns that post-*Corwin* complaints often suffer from a lack of basic facts

to encourage use of the "tools at hand" in the derivative context. And it is precisely the reason this court should encourage stockholders, if feasible, to demand books and records before filing their complaints when they have a credible basis to suspect wrongdoing in connection with a stockholder-approved transaction and good reason to predict that a *Corwin* defense is forthcoming.

Moreover, the notion that the court would engage with *Corwin*, and all that it entails, in a summary Section 220 proceeding has little to commend it as a matter of procedure, at least in the view of this trial judge. Simply stated, *Corwin* does not fit within the limited scope and purpose of a books and records action in this court.[72] Our law is settled that stockholders seeking books and records under Section 220 for the purpose of investigating mismanagement need not prove that wrongdoing or mismanagement actually occurred.[73] Thus, when a stockholder demands inspection

---

relating to the challenged transaction or attendant disclosures). I acknowledge that the author ultimately concludes that Section 220 is a "pale substitute" for expedited discovery in most deal litigation. *Id.* at 648. Even if that is so, as the poet John Heywood exhorted, "somewhat is better than nothyng (sic)." John Heywood, *Dialogue of Proverbs* (1546).

[72] *Cf. Salberg v. Genworth Fin., Inc.*, 2017 WL 3499807, at *5–6 (Del. Ch. July 27, 2017) (finding in a Section 220 proceeding that *Corwin* could not form the basis for challenging the "colorability" of a claim under the *Garner v. Wolfinbarger* analysis).

[73] *See Thomas & Betts*, 681 A.2d at 1031 ("[Stockholders] are not required to prove by a preponderance of the evidence that waste and management are actually occurring."); *Sec. First*, 687 A.2d at 568 (same); *Yahoo!*, 132 A.3d at 780 ("To state what should be obvious, the existence of a credible basis to suspect possible wrongdoing sufficient to warrant further investigation does not mean that wrongdoing actually occurred. Even in

as a means to investigate wrongdoing in contemplation of a class or derivative action, Delaware courts generally do not evaluate the viability of the demand based on the likelihood that the stockholder will succeed in a plenary action.[74] In the rare circumstances where inspection rights have been denied based on an assessment of the merits of the claim the stockholder seeks to investigate, the courts have emphasized either that the claim was simply not "justiciable,"[75] or that the claim on

---

*Disney*, where the complaint survived a motion to dismiss, the defendants ultimately prevailed.").

[74] *Wolst v. Monster Beverage Corp.*, 2014 WL 4966139 at *1–2 (Del. Ch. Oct. 3, 2014) ("A potentially viable affirmative defense to an anticipated derivative claim will not necessarily defeat a books and records effort. Sometimes developing the record to withstand possible affirmative defenses requires more effort than is practicable for a books and records action."); *La. Mun. Police Empls.' Ret. Sys. v. Countrywide Fin. Corp.*, 2007 WL 2896540, at *12 (Del. Ch. Oct. 2, 2007) ("[The defendant company] seeks to litigate the ultimate issue in a possible future derivative suit that might eventually be filed by [the plaintiff]. This is neither the time nor the procedural setting to address that issue."); *Amalgamated Bank v. UICI*, 2005 WL 1377432, at *2 (Del. Ch. June 2, 2005) ("The potential availability of affirmative defenses to withstand fiduciary duty claims cannot solely act to bar a plaintiff under Section 220."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *6 (Del. Ch. Apr. 28, 2004) ("[Allowing merits-based defenses] would turn on its head both § 220 and the case law upholding a books and records inspection for the purpose of investigating mismanagement."); *Khanna v. Covad Commc'ns Gp., Inc.*, 2004 WL 187274, at *6 (Del. Ch. Jan. 23, 2004) ("To engage in the [merits-based burden-shifting analysis] would defeat the purposes of this summary proceeding and the underlying policy guidance that potential plaintiffs use the procedures of Section 220 to determine if a case exists for the shareholder to pursue.'").

[75] *See, e.g.*, *Se. Pa. Trans. Auth. v. AbbVie Inc.*, 2015 WL 1753033, at *13 (Del. Ch. Apr. 15, 2015) ("[I]f a stockholder seeks inspection solely to evaluate whether to bring derivative litigation, the corporate wrongdoing which he seeks to investigate must necessarily be justiciable.").

its face was not viable as a matter of law.[76]  In either event, it was clear to the court that no amount of additional information would aid the stockholder in pleading or prosecuting the contemplated plenary action, so the inspection demand was denied.[77]

Although our courts have not addressed whether a company may invoke *Corwin* as a bar to inspection in a Section 220 proceeding, this court has rejected similar attempts to invoke merits-based defenses that turn on doctrinal burden shifting as a basis to defend otherwise properly supported demands for inspection. For instance, in *Khanna v. Covad Communications Group*, the defendant argued that the plaintiff could not demonstrate a credible basis to suspect wrongdoing because the challenged transactions "were approved by a majority of directors whose

---

[76] *See id.* ("Because a Section 102(b)(7) exculpatory provision serves as a bar to stockholders recovering for certain director liability in litigation, a stockholder seeking to use Section 220 to investigate corporate wrongdoing solely to evaluate whether to bring derivative litigation has stated a proper purpose only insofar as the investigation targets non-exculpated corporate wrongdoing."); *see also id.* (citing *Graulich v. Dell Inc.*, 2011 WL 1843813, at *5 (Del. Ch. May 16, 2011) (addressing time bar); *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *6 (Del. Ch. Feb. 12, 2009) (addressing issue preclusion)).  *But see Yahoo!*, 132 A.3d at 785–87 (discussing circumstances where a Section 102(b)(7) defense will not defeat a books and records demand).  I note that West's brief did make a passing reference in a footnote to the fact that West's charter contains an exculpatory provision.  West made no real attempt to argue why that provision should bar Lavin's claim for inspection here.  In any event, I note that the thrust of Lavin's argument is that there is a credible basis to suspect that directors and officers violated the duty of loyalty in connection with the Merger.  That claim, if ultimately viable, would not be captured within Section 102(b)(7) or West's exculpatory provision.  *Yahoo!*, 132 A.3d at 785–87 (explaining that claims against officers and claims for breach of the duty of loyalty are "not subject to exculpation").

[77] *Id.*

25

independence and disinterestedness are not fairly questioned by [the plaintiff]."[78]

The court disagreed:

> The shareholder seeking to investigate corporate wrongdoing, if [the defendant's] analytical approach were adopted, would first be required to survive the functional equivalent of a merits-based dismissal motion in the substantive action. While the analysis to be undertaken in considering those motions is, of course, important, the Section 220 action is not the proper forum for that analysis.[79]

*Khanna* correctly observed that a summary Section 220 proceeding is hardly the proper setting to consider the nuanced factual and legal questions that are frequently featured when the court is asked to apply Section 144 of the DGCL.[80] The legal and factual questions presented by a properly-invoked *Corwin* defense are no less challenging.[81]

---

[78] *Khanna*, 2004 WL 187274, at *6.

[79] *Id.* The Supreme Court quoted *Khanna* approvingly in *Seinfeld*, 909 A.2d at 123.

[80] 8 *Del. C.* § 144(a); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1154 (Del. Ch. 1994) (Allen, C.) ("[C]ompliance with the terms of Section 144 does not restore to the board the presumption of the business judgment rule; it simply shifts the burden to plaintiff to prove unfairness.") (citing *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110 (Del 1994)).

[81] West advances additional merits-based arguments to support its position that the Merger was not the product of a conflict-driven process. Def. West's Opening Br. 26–29 (citing, *inter alia*, *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1031 (Del. Ch. 2012); *In re Cyan, Inc. S'holders Litig.*, 2017 WL 1956955, at *10 (Del. Ch. May 11, 2017); *Larkin*, 2016 WL 4485447, at *16–17). For the reasons discussed above, these merits-based arguments are premature and should be saved for whatever plenary action Lavin or other stockholders may choose to file. *See, e.g.*, *Marmon*, 2004 WL 936512, at *6 ("[Allowing merits-based defenses] would turn on its head both § 220 and the case law upholding a books and records inspection for the purpose of investigating mismanagement.").

In rejecting West's argument that I should take up its *Corwin* defense now as a basis to deny Lavin's Section 220 demand, I do not mean to diminish the pleading stage business judgment deference that must be afforded fiduciaries whose decisions are approved by properly informed disinterested stockholders freely exercising their right to vote their shares. Nor do I intend to suggest that the fiduciaries Lavin may choose to name in a plenary action will not prevail should they invoke *Corwin* in a motion to dismiss Lavin's complaint. At this stage, I am simply recognizing that Lavin will bear a burden to be precise in his pleading should he challenge the stockholder vote approving the Merger. Documents he receives under Section 220 may enable him to prepare a better complaint. That, in turn, will assist the court in making an informed decision as to whether a viable breach of fiduciary duty claim exists.[82]

## C. Lavin's Proper Purposes

Lavin's primary purpose in seeking the Company's books and records is to investigate whether West's directors and officers breached their fiduciary duties by approving a sale of West to Apollo for an inadequate price. If an investigation

---

[82] I note that Lavin has timed his Section 220 demand appropriately. Had he waited to initiate this action until after he brought his plenary action, not only would his complaint lack the fruits of his Section 220 yield, he also likely would be deemed to have improperly employed Section 220 as a substitute for discovery. *See Khanna*, 2004 WL 187274, at *9 ("A Section 220 action is not a substitute for discovery under the rules of civil procedure.") (citing *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 n.10 (Del. 2002)).

reveals wrongdoing, he intends to institute litigation against the directors, officers and possibly others, including Apollo. He also seeks books and records related to director independence. To prevail, Lavin must have presented "some evidence" of mismanagement or wrongdoing.[83]

### 1. The Evidence Reveals a Credible Basis to Infer Wrongdoing

As Lavin established at trial, the evidence provides a credible basis from which the Court can infer that TH Lee, Quadrangle and West's management may have caused the Board to steer the Merger process in a way that benefited their own interests at the expense of the other shareholders.

*First*, Lavin presented a credible basis in the evidence to infer that West's directors and officers knew a sale of West's business segments would provide the most value to the shareholders even though the shareholders may not have been able to appreciate the distinction.[84] Lavin points to the Proxy where the Board discloses

---

[83] *Seinfeld*, 909 A.2d at 118 (explaining that the credible basis standard is the equivalent of "some evidence" of wrongdoing).

[84] This court has observed that a board's failure adequately to consider a break-up and sale of parts or divisions may constitute a breach of the duties of care and loyalty under *Revlon*. *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 445 (Del. Ch. 2012) (discussing how the failure to test the market for possible sale of "business units is, of course, relevant to any *Revlon* inquiry," and "that [the] failure was compounded by a deal protection package"); *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *26 (Del. Ch. Mar. 23, 2012) (holding that plaintiffs presented a viable claim that defendants breached fiduciary duties under *Revlon* by "selling the Company as a whole" instead of selling its divisions in separate transactions), *aff'd in part, rev'd on other grounds*, 59 A.3d 418 (Del. 2012); *Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *15–16 (Del. Ch. July 29, 2008) (denying defendants' motion for summary judgment, in part, because there was a genuine dispute as

that in July 2016, "the Board, Centerview and Company management observed that West's various segments exhibit differing financial profiles and, as a result, investors may have difficulty giving appropriate value to the Company's individual segments or the Company as a whole."[85]  While stockholders might not have appreciated the value of selling off the business segments separately, the evidence suggests that, prior to the Merger, the Board may have been thinking along these lines after reviewing and then presenting "Sum of the Parts Valuation Metrics" as part of its presentation at the "Analyst Day" meeting in 2016.[86]  Potential buyers likewise appreciated that a sale of West's business segments may have been more valuable

---

to whether they breached their fiduciary duties by disregarding "the possibility of breaking [the company] up into more valuable parts, particularly given [its] unique market niche and [the CEO's] assessment that few companies would be interested in acquiring [the company] in *toto*."), *rev'd*, 970 A.2d 235, 243 (Del. 2009) (holding that plaintiffs failure to show that defendants acted in bad faith was dispositive, but the Court of Chancery's decision would have been upheld if the issue "were whether the directors had exercised due care").

[85] JX 5 (Proxy) at 30.

[86] JX 16 (Form 8-K) at 49; *see also* JX 5 (Proxy) at 29 ("[In the beginning of 2016] [t]he Board instructed Company management to begin an evaluation of each of the Company's segments, both individually and as a whole, including the creation of five-year financial projections for the Company and its segments. . . .  Beginning in the spring of 2016 and continuing into the fourth quarter of 2016, Company management continued its business and financial analysis of each of the Company's segments, including a review of the competitive landscape, market trends, growth opportunities, profitability, margins, products and services of each segment.").

than a whole-company sale,[87] as revealed in the fact that at least two bidders (Party H and Party L) made sizable offers for certain of West's segments.[88] This is "some evidence" from which the Court can infer that the Board and its high-level officers may have believed that a sale of separate business segments would have yielded more value to West's shareholders than a sale of the whole company.[89]

*Second*, Lavin presented some evidence from which the Court can infer that TH Lee and Quadrangle pushed the Board towards a sale of the Company in furtherance of their own interests to the detriment of West's stockholders. At the time of the Merger, TH Lee and Quadrangle had been West stockholders since 2006, meaning their investments were likely approaching their horizons.[90] There is no

---

[87] JX 5 (Proxy) at 32–35 (showing several third parties expressing interest in all of West's segments).

[88] JX 5 (Proxy) at 35.

[89] As noted, the Merger Agreement's no-shop provision also may have prevented a more valuable sale of segments from occurring. *See* JX 5 (Proxy) at 8, 85–87.

[90] *See* Usha Rodrigues & Mike Stegemoller, *Exit, Voice, and Reputation: the Evolution of SPACS*, 37 Del. J. Corp. L. 849, 853 (2013) ("To prevent the manager from merely sitting on the money, the [private equity] fund faces a limited investment horizon; after ten years, investors get their money back."); Mark J. Roe, *Corporate Short-Termism—In the Boardroom and in the Courtroom*, 68 Bus. Law. 977, 987–88 (2013) (noting that private equity funds "often [have] time horizons of years, sometimes stretching toward a decade"); Brian Cheffins & John Armour, *The Eclipse of Private Equity*, 33 Del. J. Corp. L 1, 11 (2008) ("Most private equity funds are established for a fixed term, typically ten years, consisting of an investment period when the general partners make capital calls and a holding period where existing investments are managed, developed, and ultimately sold. Unless an extension is secured, when the term has expired, the fund must sell its investments and return the capital to fund investors.").

question that the private equity funds' managers served on the Board (Huber, DiNovi and Grattan). And there is no question that the funds had a contractual right to seat two additional directors which, if exercised, would result in their control of half the Board. TH Lee and Quadrangle may also have had a degree of control over Sloma and Garcia, as these two directors were appointed to the Board while the funds controlled the Company and maintained a contractual right to control the Board composition.[91] The funds had been in liquidation mode leading up to the time West started receiving expressions of interest,[92] and they agreed to leave money on the table in the Merger—$3–$5 million for an employee retention plan—in order to get the deal across the finish line.[93] Thus, there is some evidence that TH Lee and

---

[91] JX 8 (Annual Meeting Proxy) at 5; JX 9 (West's Prospectus) at 80. I reject West's contention that Lavin waived his argument regarding TH Lee's and Quadrangle's alleged control over half the Board. The doctrine of waiver operates to ensure fairness by requiring that notice be given to the adverse party. *See PharmAthene v. SIGA Tech., Inc.*, 2011 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) ("The general rule . . . that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance."). Lavin presented this issue squarely in his opening brief. This provided West plenty of notice of the claim and more than a fair opportunity to address it at trial. *See* Pl. Lavin's Opening Br. 4–5, 14–15, 25. It is also clear from Lavin's initial demand for inspection that he was concerned about TH Lee's and Quadrangle's ability to pressure the Board. JX 3 (Lavin's Demand to Inspect Books and Records) at 4.

[92] *E.g.*, JX 10 (West March 2015 Secondary Offering Prospectus Supplement).

[93] JX 5 (Proxy) at 39 ("DiNovi noted that THL and Quadrangle would be willing to provide between $3 million and $5 million (in the aggregate) of their proceeds from the transaction to fund an additional retention plan for the Company's senior management, payable at the closing of the transaction.").

Quadrangle desired and obtained a prompt liquidation of their aging investments for a price that may have been unfair to the other stockholders.[94]

*Third*, Lavin presented some evidence from which the Court can infer that the directors and high-level officers had financial incentives to approve a sale of the Company even if a sale of its segments offered more value. Barker, the Chairman and CEO, was set to receive a golden parachute payment of approximately $19 million plus millions more in equity awards in the event the Company was sold as a whole. And each of the non-employee directors was set to receive approximately $200,000 for a sale of the Company as a whole, which they otherwise might not have received if the Company continued on a standalone basis or sold its segments.[95] From this evidence, there is a credible basis to infer that the directors

---

[94] West argues that TH Lee and Quadrangle could have engaged in another secondary offering or distributed their holdings in kind to their limited partners if they needed to wrap up their investment in West. Although that may be true, Lavin has presented some evidence that these courses of action may not have been preferable when compared to a prompt whole-company sale that resulted in both immediate liquidity and a premium to the trading price. The other options that West presents could have resulted in less value to the funds and their limited partners. *See* JX 5 (Proxy) at 45 ("[I]f the Company did not enter into the merger agreement, [TH Lee and Quadrangle] could elect to distribute their shares of West common stock to their limited partners, which could have a negative impact on the Company's stock price."); JX 12 (Yahoo! Finance Chart) (showing drops in West's stock price following secondary offerings).

[95] West argues that the awards to the independent directors is not evidence of anything because they would have received equity grants regardless of whether *vel non* the Merger occurred (Tr. at 58:23–59:6). But the Merger resulted in the vesting of restricted stock units *plus* a cash award. JX (Proxy) 5 at 58. It is reasonable to infer that the non-employee directors' stock units would have remained restricted if the Merger did not close, because

32

faced two options—a sale of the Company as a whole or a more valuable sale of its segments—and they pursued the less valuable option that provided benefits to them that were not enjoyed by the other shareholders.

With the low Section 220 evidentiary threshold very much in mind, I am satisfied that Lavin has presented "legitimate issues of wrongdoing."[96] Stated differently, Lavin has presented "some evidence" that West's directors and officers may have breached their *Revlon* duties, possibly in bad faith.[97] Accordingly, he has stated a proper purpose to inspect certain documents related to the Merger process.[98]

---

otherwise there would have been no point to allowing those units to vest "as a result of the merger." JX 5 (Proxy) at 57–58.

[96] *Sec. First Corp.*, 687 A.2d at 568 ("[T]he threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing.").

[97] *See In re El Paso*, 41 A.3d at 445 (noting that failure to "do a soft check of the market [for the target company's] attractive business units is, of course, relevant to any *Revlon* inquiry, but particularly when questions of loyalty exist," and that the failure was "important because it was clear that the most valuable alternative to the Merger . . . was likely a sale of El Paso's two main businesses to separate buyers (the kind of break-up that was de rigeur in the 1980s), or a sale of one business while retaining the other as a standalone public company (a twist on the spin-off)"); *In re Netsmart Tech., Inc. S'holder Litig.*, 924 A.2d 171, 198–99 (Del. Ch. 2007) (finding that plaintiffs demonstrated reasonable probability of success in a *Revlon* claim observing that the board "rapidly narrowed its options to a channel consistent with [the directors' personal] incentives" by pursuing a deal with private equity bidders over a strategic buyer).

[98] West offers *Marathon P'rs, L.P. v. M&F Worldwide Corp.* as comparable to this case and argues that Lavin has presented only "speculation of mismanagement." 2004 WL 1728604, at *7 (Del. Ch. July 30, 2004). *Marathon* is distinguishable on its facts, as the plaintiff in that case suspected the directors breached their *Revlon* duties when they rebuffed a single overture outside of any bidding process. *Id.* Unlike *Marathon*, this case involves a company that was actually "in play" and Lavin has presented some evidence

## 2. Director Independence

In the midst of proving his credible basis to suspect wrongdoing in connection with the Merger process, Lavin also demonstrated that he has a proper purpose to investigate director independence. It is well established that the desire to investigate director independence is a proper purpose.[99] Such an inspection is especially proper in this case because Lavin has shown that there is a credible basis to question whether TH Lee and Quadrangle, as a practical matter, controlled half of the Board.[100]

## D. Scope of Production

Lavin seeks to inspect thirteen categories of books and records that he claims "address the crux" of his stated purposes.[101] Some of these materials are warranted; others are not. Specifically, I am satisfied that the following categories of documents

---

that those at the levers of control may have steered the sale process in a direction that benefited them personally.

[99] As observed in *Amalgamated Bank v. Yahoo!*, our courts routinely conclude that a stockholder states a proper purpose when he seeks to investigate director independence and disinterestedness. 132 A.3d at 784–85 ("[T]he Delaware Supreme Court has indicated that a plaintiff could obtain 'a file of the disclosure questionnaires for the board' or similar materials that could 'provide more detail about the thickness of the relationship[s]' in the boardroom.") (citing *Del. Cty. Empls.' Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 (Del. 2015)).

[100] *See, e.g.*, JX 7 (S'holder Agreement) at 2 (showing that TH Lee and Quadrangle have a contractual right to appoint five of West's ten directors).

[101] Pl. Lavin's Opening Br. 27 (quoting *Wal-Mart Stores, Inc. v. Ind. Elec. Works Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014)).

are "necessary and essential"[102] to pursue Lavin's proper purposes, as determined above:

> (1) Sum-of-the-parts metrics, analyses and presentations that were provided to the Board by Centerview or West's officers from January 1, 2016 to July 26, 2017; (2) indications of interest, offers, terms sheets and draft agreements that West received from or exchanged with bidders from January 1, 2016 to July 26, 2017, whether related to a potential sale of the Company as a whole or a sale of its segments; (3) Board minutes related to indications of interest and offers to purchase the Company's segments from January 1, 2016 to July 26, 2017; (4) books and records reflecting communications related to a potential sale of one or more of West's segments between Barker, Jan Madsen, David Treinen, DiNovi or Huber, on the one hand, and any officer, director, employee or agent of Centerview or any potential acquirer of any part of the Company, on the other hand, from January 1, 2016 to July 26, 2017, including (but not limited to) emails, memoranda and notes;[103] *and* (5) materials provided to the Board or any of its committees from January 1, 2016 to July 26, 2017 concerning the independence or disinterestedness of any director, including any disclosure questionnaires.

Because many of Lavin's document demands landed with the precision of buckshot,[104] I have awarded inspection of only those documents that are necessary

---

[102] *Wal-Mart Stores*, 95 A.3d at 1278 (discussing the "necessary and essential" standard).

[103] *See Yahoo!*, 132 A.3d at 791–94 (ordering the production of targeted electronic documents and emails because they were "corporate records" that would "show what [key players] knew and when").

[104] *Id.* at 776 ("The production order 'must be carefully tailored.' Framed metaphorically, it should be 'circumscribed with rifled precision' to target the plaintiff's proper purpose.") (quoting *Sec. First*, 687 A.2d at 565, 570). For instance, Lavin seeks "**all** books and records provided to or referred by the individuals who drafted the [Proxy]," "**all** documents produced to any other stockholder or their counsel in response to a demand" under Section 220 and "**all** books and records reflecting communications between [six officers and directors] and any officer, director, employee or agent of Centerview, LionTree

to enable him to pursue the proper purposes articulated in his inspection demand. To reiterate, the credible basis to suspect wrongdoing here raises the question of whether the Board, for self-interested reasons, favored a less valuable sale of the Company over a more valuable sale of its segments. The relevant time period implicated by this question is January 2016 through July 2017—the period beginning when third-parties first expressed interest and the Board began contemplating strategic transactions, and ending with the stockholder vote approving the Merger.[105] The documents in the permitted categories will allow Lavin to investigate whether the Board knew a sale of segments separately would be more valuable to stockholders than the Merger, and whether the Board pursued the Merger nevertheless for the benefit of its members, senior management, and private equity investors and to the detriment of the other stockholders. When measured against the Proxy, the documents may also offer some insight into whether the stockholder vote was fully informed as Lavin attempts to meet his pleading burden in anticipation of a *Corwin* defense.

---

Advisors, LLC . . . Apollo, or any other potential acquiror of the Company or any part thereof." Lavin's Opening Br. 28–39 (citing JX 3 (Lavin's Demand to Inspect Books and Records)) (emphasis supplied).

[105] *See* JX 5 (Proxy) at 29; JX 13 (West's Form 8-K filed July 27, 2017) at 2.

## III.  CONCLUSION

For the foregoing reasons, a judgment shall be entered in favor of Lavin that directs the Company to allow inspection of the books and records designated in this Opinion.  Lavin shall submit a proposed implementing order and final judgment on notice to West within ten (10) days.

**IT IS SO ORDERED.**